Reuben D. Nathan, Esq. (SBN 208436)
**NATHAN & ASSOCIATES, APC**
2901 W. Coast Hwy., Suite 200
Newport Beach, CA 92663
Office: (949) 270-2798
Email: rnathan@nathanlawpractice.com

Ross Cornell, Esq. (SBN 210413)
**LAW OFFICES OF ROSS CORNELL, APC**
P.O. Box 1989 #305
Big Bear Lake, CA 92315
Office: (562) 612-1708
Email: rc@rosscornelllaw.com

Attorneys for Plaintiff, DANIEL VESELY

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| DANIEL VESELY, on behalf of himself and all similarly situated persons,<br><br>                              Plaintiff,<br><br>v.<br><br>SUSSEX PUBLISHERS, LLC, a Delaware Limited Liability Company,<br><br>                              Defendant. | Case No:<br><br>**CLASS ACTION COMPLAINT**<br><br>1)  Cal. Penal Code § 638.51<br>2)  Cal. Penal Code § 631<br>3)  Cal. Constitution Art. I § 1<br>4)  Cal. Bus. & Prof. Code § 17200, *et seq.*<br>5)  Intrusion Upon Seclusion<br>6)  Unjust Enrichment |
| --- | --- |

1

Plaintiff DANIEL VESELY ("Plaintiff") files this class action complaint on behalf of himself and all others similarly situated (the "Class Members") against Defendant SUSSEX PUBLISHERS, LLC, a Delaware Limited Liability Company ("Defendant" or "Psychology Today"). Plaintiff brings this action based upon personal knowledge of the facts pertaining to himself, and on information and belief as to all others, by and through the investigation of undersigned counsel.

## I.    <u>NATURE OF THE ACTION</u>

1.      This is a class action lawsuit arising from Defendant's deployment of third-party tracking technologies on its website, www.psychologytoday.com (the "Website"). Through these technologies, third parties (1) intercepted and read the contents of Plaintiff's and Class Members' communications with the Website, including human-readable URLs identifying the specific editorial and commercial content accessed, in violation of California Penal Code § 631(a); and (2) captured dialing, routing, addressing, and signaling information associated with those communications, including IP addresses and device identifiers, in violation of California Penal Code § 638.51.

2.      When Plaintiff and Class Members visited the Website, they searched terms and browsed pages reflecting their personal interests, including editorial content about sexuality, relationships, and mental health. Embedded third-party scripts intercepted and transmitted the full URLs of those search queries and article pages to servers operated by Google and Comscore, exposing what Plaintiff and Class Members chose to read. For example, URLs such as https://www.psychologytoday.com/us/archive?search=Low+sexual+drive+in+young+women and https://www.psychologytoday.com/us/basics/low-sexual-desire set forth specific content revealing Plaintiff's sensitive personal interests. These URLs do not merely identify server destinations. They disclose the substance and meaning of Plaintiff's private communication with the Website, including what Plaintiff was reading, viewing, and engaging with. This information constitutes "contents" within the meaning of California Penal Code § 631(a).

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

3.      In addition to intercepting the contents of Plaintiff's communications, the same tracking technologies captured dialing, routing, addressing, and signaling information associated with those communications. This information includes IP addresses identifying the source of the communication, referrer headers identifying the routing path, device and browser identifiers, session identifiers, and timestamps. To the extent these data elements function as routing or signaling data rather than communication contents, their capture constitutes the unauthorized use of a pen register or trap-and-trace device in violation of California Penal Code § 638.51.

4.      Defendant did not obtain Plaintiff's or Class Members' consent before causing their communications to be intercepted or before deploying pen register or trap-and-trace functionality on their devices. The tracking technologies execute automatically upon page load, before any user interaction and before any opportunity to review or accept privacy disclosures. Plaintiff and Class Members did not knowingly or voluntarily agree to the interception of their communications or the capture of their routing and addressing information by third parties.

5.      A pixel tracker, also known as a web beacon, is a tracking mechanism embedded in a website that monitors user interactions. It typically appears as a small, transparent 1x1 image or a lightweight JavaScript snippet that activates when a webpage is loaded, or a user performs a tracked action.

6.      When triggered, the pixel causes the user's browser to transmit data to third-party servers, including page-view events, page URLs, referrer headers, session-level identifiers, network-level IP addressing information, browser and device characteristics, and related navigation metadata.

7.      When Plaintiff's browser executes the Trackers' scripts, each HTTP request necessarily transmits Plaintiff's IP address as part of the communication's routing infrastructure. The Trackers also cause the browser to transmit additional device metadata, browser characteristics, persistent tracking identifiers, and navigation data to third-party servers, all transmitted automatically during page load without user

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

interaction or consent.

8.      When users visit the Website, Defendant causes tracking technologies to be embedded in visitors' browsers. These include, but are not limited to, the following:

- Google Analytics / Google Ads / DoubleClick Trackers
- Scorecard Research Beacons (Comscore)

9.      The third parties that operate the tracking technologies embedded in the Website collect and receive User Information (defined below) generated by visitors' interactions with the Website and use that information for their own independent commercial purposes. As alleged herein, these third parties participate in advertising, analytics, audience-measurement, and data-profiling ecosystems that extend beyond Defendant's internal website operations. The information collected through the Website is used by these third parties to support functions such as measurement, attribution, audience segmentation, and data monetization for their own benefit. The tracking technologies described above are referred to collectively as the "Trackers."

10.     The Trackers are operated by distinct third parties, including Google LLC (as to Google Analytics, Google Ads, and DoubleClick tracking technologies), Comscore, Inc. (as to Scorecard Research tracking beacons) (collectively, the "Third Parties"). Defendant knowingly enables and deploys these Trackers on the Website and causes them to execute automatically within users' browsers during ordinary page loads, transmitting URLs identifying the specific content users accessed on the Website, along with referrer paths, IP addresses, persistent third-party identifiers, device and browser characteristics, and timestamps to servers controlled by the Third Parties. These transmissions serve purposes including analytics, advertising attribution and targeting, retargeting, cross-device identity resolution, and real-time bidding. Defendant's conduct is intentional and coordinated, as the Trackers operate pursuant to Defendant's design and configuration choices and are not required to render or display the Website's content.

/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

11.     Through the Trackers, the Third Parties collect information from users' browsers and devices without users' knowledge or consent. This information includes full page URLs identifying the specific content users accessed; referrer URLs revealing users' browsing paths; users' IP addresses; browser and device type; operating system; screen dimensions; language settings; and unique session- and device-level identifiers assigned by third-party tracking systems. Collectively, this information ("User Information") is used for analytics, behavioral measurement, advertising attribution, and targeted advertising. Defendant knowingly enables these Trackers and benefits from the unconsented collection and use of User Information.

12.     The third-party tracking code executed automatically during each page load and navigation event initiated by Plaintiff's browser. As pages were loaded and rendered, embedded scripts executed in parallel with the retrieval of Website content and caused the automatic transmission of dialing, routing, addressing, and signaling information to remote third-party endpoints during the page-load process itself. These transmissions occurred before the page finished rendering and without any user interaction, notice, or authorization.

13.     The third-party tracking requests to Google and Comscore servers were initiated and completed while the browser was still receiving and rendering the webpage Plaintiff requested. The tracking transmissions carrying Plaintiff's content-bearing URLs and signaling data were not deferred until after the page had fully loaded; they occurred during the page-loading process itself, while Plaintiff's communication with the Website remained in transit.

14.     Plaintiff and the Class Members did not consent to the installation, execution, embedding, or injection of the Trackers on their devices and did not expect their behavioral data to be disclosed or monetized in this way. The Website did not display any consent banner, pop-up, cookie notice, or prior disclosure requesting authorization before installing pen-register or trap-and-trace technology. General statements in a privacy policy buried behind non-blocking hyperlinks do not constitute

the express prior consent.

15.    Generalized references herein to users, visitors and consumers expressly include Plaintiff and the Class Members.

## II.    PARTIES

16.    Plaintiff DANIEL VESELY is a California citizen residing in Los Angeles County and has an intent to remain there.  Plaintiff was in California when he visited the Website, which occurred on multiple days during the class period including but not limited to on February 5, 2026.  The allegations set forth herein are based on the Website as configured when Plaintiff visited it.

17.    Defendant, SUSSEX PUBLISHERS, LLC is a Delaware Limited Liability Company that owns, operates, and/or controls the Website, an online platform through which Defendant offers goods and services to consumers.

18.    Defendant is a digital media company that publishes articles, blog posts, and resources on psychology, mental health, relationships, sexuality, and personal well-being. Defendant is organized under the laws of the State of Delaware and maintains its principal executive offices in New York. Through its online platform and digital channels, Defendant publishes articles, blog posts, and resources on psychology, mental health, relationships, and sexuality to consumers throughout the United States.

19.    Defendant conducts business nationwide and engages in extensive content publishing, marketing, and commercial operations centered on its digital media platform. A substantial component of Defendant's business model involves digital marketing, advertising revenue generation, and data-driven audience engagement, including the use of web-based technologies to promote content, analyze user behavior, optimize engagement, and serve targeted advertising.

20.    The Website, including the mobile site, serves as a core component of Defendant's digital presence. The Website provides consumers with access to articles on psychology, mental health, relationships, and sexuality, a therapist directory, self-assessment tools, and mental health resources, and functions as a primary consumer-

facing platform through which users browse content and access mental health resources. The Website is integrated into Defendant's broader digital marketing and analytics infrastructure, and Defendant deploys tracking and measurement technologies on the Website to monitor page loads, navigation, and user interactions for advertising, attribution, analytics, and performance-measurement purposes.

### III.    JURISDICTION AND VENUE

21.    This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs, and the proposed class consists of more than 100 members. Minimal diversity exists because at least one member of the proposed class is a citizen of a State different from at least one Defendant.

22.    Defendant operates a nationwide, consumer-facing digital media platform through which it publishes articles, blog posts, and resources on psychology, mental health, relationships, and sexuality to consumers in California. Defendant's Website is accessible to and regularly used by California residents seeking mental health and psychology content.

23.    Defendant deliberately integrates a multi-vendor advertising, analytics, and identity-tracking ecosystem into its Website. That ecosystem includes tracking and measurement technologies operated by Google LLC and Comscore, Inc. Each of these entities provides commercial platforms whose ordinary function is to collect, process, and monetize information associated with users' navigation of commercial websites. Defendant's selection and deployment of these specific vendors reflects a knowing and ongoing engagement with an advertising and data-monetization ecosystem rooted in California.

24.    The third-party platforms Defendant selected and deployed maintain substantial operational ties to California. Google LLC is headquartered in Mountain View, California, and operates major analytics, advertising, and cloud infrastructure

from California-based facilities.    Likewise, Comscore, Inc. maintains significant operational ties to California through its advertising and audience measurement clients, data partnerships, and integration with California-based advertising platforms. Each of these entities relies on large-scale cloud infrastructure, content-delivery networks, and internet exchange points with established presence in California as part of their ordinary operations.

25.    Each page load and navigation event on Defendant's Website constitutes a separate contact between Defendant's tracking infrastructure and California residents' devices. The evidence shows that a single browsing session on the Website generated dozens of tracking requests across multiple third-party vendors, each transmitting the user's addressing and signaling information to servers operated by California-based companies. These contacts are not isolated or sporadic; they occur automatically, repeatedly, and systematically each time a California resident accesses any page on the Website.

26.    The advertising, analytics, and identity platforms deployed by Defendant are not passive or incidental service providers. Google's analytics and advertising systems and Comscore's audience measurement platform all depend on the automated capture and transmission of addressing and signaling information, including IP addresses, page URLs, referrer headers, timestamps, and persistent identifiers, in order to recognize users, correlate browsing activity across sessions and domains, perform attribution and analytics, and support advertising and data-monetization functions. By embedding these technologies into the ordinary operation of its Website, Defendant knowingly enables the extraction and downstream commercial use of California residents' information within programmatic advertising ecosystems operated by California-headquartered companies.

27.    Defendant's knowledge that its Website transmits California users' information to third-party trackers, combined with its deliberate configuration of those trackers to fire automatically at page load before any consent is obtained, establishes that

the resulting privacy harm to California residents was foreseeable and intended rather than an unintended byproduct of internet communication.

28.    Taken together, Defendant's operation of a nationwide digital media platform serving California consumers, its deliberate integration of tracking technologies operated by companies headquartered in California and the repeated, systematic transmission of California users' communication content and addressing and signaling information to California-based advertising and identity platforms establish that Defendant purposefully directed its data-collection and advertising activities toward California residents. The exercise of personal jurisdiction over Defendant in this forum is consistent with due process and California law.

29.    Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1391(b) because (1) Plaintiff resides in this District with an intent to reside indefinitely; (2) Defendant regularly transacts business in this District and is subject to personal jurisdiction here; and (3) a substantial part of the events or omissions giving rise to the claims occurred within this District.

## IV.    <u>GENERAL ALLEGATIONS</u>

### 1.    The California Invasion of Privacy Act (CIPA)

30.    Enacted in 1967, the California Invasion of Privacy Act (CIPA) safeguards the privacy rights of California residents by prohibiting unauthorized wiretapping and eavesdropping on private communications. The California Legislature declared that "the development of new devices and techniques for the purpose of eavesdropping upon private communications … has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society" (Cal. Penal Code § 630).

31.    CIPA prohibits the installation or use of "pen registers" and "trap and trace devices" without consent or a court order (Cal. Penal Code § 638.51(a)). A pen register is "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted," excluding the contents of the communication (Cal. Penal

Code § 638.50(b)). A trap and trace device captures "incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication," again excluding contents (Cal. Penal Code § 638.50(b)). In practical terms, a pen register records outgoing dialing information, while a trap and trace device records incoming dialing information.

32.     CIPA's wiretapping provision, section 631(a), also reaches the use of modern tracking technologies that intercept website communications in transit. It makes it unlawful for any person, by means of any machine, instrument, or other contrivance, to willfully "read" or attempt to learn the contents or meaning of a message while it is being transmitted, without the consent of all parties, and to use or disclose information obtained through such interception or to aid a third party in doing so. In the website context, plaintiffs allege that embedded code such as pixels, session replay scripts, and chat integrations function as wiretaps by duplicating visitors' HTTP requests, URLs, clicks, keystrokes, and other interaction data as those communications travel between the user's device and the site, and routing a live copy to third party adtech or analytics vendors. In practical terms, section 631(a) is invoked when tracking tools allow an uninvited third party to contemporaneously intercept and exploit the substance of users' interactions with a website.

33.     Though enacted to address wiretapping of telephone calls, CIPA has been interpreted to apply to internet-based technologies consistent with the statutory scheme. Javier v. Assurance IQ, LLC, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, [CIPA] Section 631(a) applies to Internet communications."); Shah v. Fandom, Inc., 754 F. Supp. 3d 924, 930 (N.D. Cal. 2024) (finding web trackers were "pen registers" and noting courts "do not read California statutes as limiting themselves to the traditional technologies or models in place at the time the statutes were enacted"); Mirmalek v. Los Angeles Times Communications LLC, 2024 WL 5102709, at *3-4 (N.D. Cal. Dec. 12, 2024) (same); Moody v. C2 Educ.

Sys. Inc., 742 F. Supp. 3d 1072, 1076 (C.D. Cal. 2024) (finding tracker allegations "plausibly fall within the scope of §§ 638.50 and 638.51"); Greenley v. Kochava, Inc., 684 F. Supp. 3d 1024, 1050 (S.D. Cal. 2023) (referencing CIPA's "expansive language").

**2.    The Trackers Are "Pen Registers" and/or "Trap and Trace Devices"**

34.    When the Plaintiff and Class Members accessed the Website, their browsers initiated an HTTP or HTTPS request or "GET" request to Defendant's web server, which hosts the content and functionality of the site. In response, the server transmitted an HTTP response containing the necessary resources, including HTML, cascading style sheets (CSS), JavaScript files, and image assets, used by the browser to render and display the webpage. These resources also included client-side scripts that initiate communication with third-party services for analytics, marketing, and tracking purposes. The server's instructions include how to properly display the Website, *e.g.* what images to load, what text should appear, or what music should play.

35.    In addition, the server's instructions included client-side scripts that initiate communication with third-party services for analytics, marketing, and tracking purposes. The instructions cause the Trackers to be installed on a user's browser.  The Trackers then cause the browser to send identifying information—including the user's IP address and User Information to the Third Parties.  These Third Parties, through their Trackers, also set a cookie on Website users' browsers, which sends a unique identifier to these Third Parties that allows them to track users on the Website over multiple visits and across the Internet.

36.    A general diagram of this process is pictured at Figure 1, which explains how Defendant's Website transmits instructions back to users' browsers in response to HTTP requests.

/ / /

/ / /

11

## Figure 1



37.     The server's response included third-party tracking scripts that were executed by the Plaintiff's and Class Members' web browsers. These scripts, once executed, initiate client-side functions that capture routing and behavioral metadata and transmit this data, typically via HTTPS requests, to the servers of third-party tracking vendors. These actions occur without visible indicators or user awareness. The transmitted data, referred to as User Information, included identifiers such as IP addresses, device characteristics, browser types, page navigation behavior, and unique tracking cookies, all of which were used to profile users and facilitate targeted advertising.

38.     The Trackers operate by initiating HTTP or HTTPS requests using either the GET or POST method from the user's browser to external servers controlled by the Third Parties. These requests are triggered by user interactions with the Website and are used to transmit behavioral data and Device Metadata, including information such as page views, click events, session duration, and identifying browser characteristics.

39.     Plaintiff and Class Members did not provide their prior consent to Defendant to install the Trackers on their browsers or use the Trackers.  Nor did Defendant obtain a court order before installing or using the Trackers.

40.     An IP address is a numerical identifier assigned to each device or network connected to the Internet, used to facilitate communication between systems. *See hiQ Labs, Inc. v. LinkedIn Corp.*, (9th Cir. 2019) 938 F.3d 985, 991 n.4. The most common

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

format, known as IPv4, consists of four numbers separated by periods (e.g., 191.145.132.123). The traditional format of IP addresses is called IPv4, and it has a finite amount of combinations and thus is limited to approximately 4.3 billion addresses. Because this proved to be insufficient as the Internet grew, IPv6 was introduced.  IPv6 offers a vastly larger address space with 340 undecillion possible addresses.  While IPv6 adoption has been increasing, many networks still rely on IPv4.[1]

41.    Much like a telephone number, an IP address guides or routes an intentional communication signal (*i.e.*, a data packet) from one device to another.  An IP address is essential for identifying a device on the internet or within a local network, facilitating smooth communication between devices.  IP addresses can be used via external geolocation services to infer a user's general location, including state, city, approximate latitude and longitude, and in some cases, ZIP code.

42.    Public IP addresses are globally unique identifiers assigned by Internet Service Providers (ISPs) that allow devices to communicate directly over the Internet. They are globally accessible, meaning they can be reached from anywhere on the Internet, but are not inherently exposed unless data is being transmitted. Public IP addresses are essential for devices requiring direct Internet access.

43.    Public IP addresses can be used to determine the approximate physical location of a device.  For example, services like iplocation.io, use databases that map IP addresses to geographic areas, often providing information about the country, city, approximate latitude and longitude coordinates, or even the internet service provider associated with the public IP.  This geolocation capability is leveraged by online advertising and user identification services.

44.    In contrast, private IP addresses are used within internal networks and are not routable on the public Internet. The Internet Assigned Numbers Authority ("IANA")

---

[1]  *See*, *e.g.*, *What is the Internet Protocol*, Cloudflare, https://www.cloudflare.com/learning/network-layer/internet-protocol/; Stefano Gridelli, *What is an RFC1918 Address?*, NetBeez (Jan. 22, 2020), https://netbeez.net/blog/rfc1918/.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

reserves specific ranges of numbers to be exclusively used for private IP addresses (*e.g.*, 172.16.0.0 through 172.31.255.255). They are isolated from the global Internet and can be reused across different networks without conflict. For example, a home network in New York and an office network in Tokyo can both use the same private IP address (*e.g.*, 192.168.1.1) for their routers without conflict.

45. The distinction between a public and private IP address is fundamental to the architecture of modern networks. Public IP addresses facilitate global communication, while private IP addresses conserve the finite amount of combinations to make an IP address through local network communication. And crucially, a private IP address does not divulge a user's geolocation, whereas a public IP address does and is thus extensively used in advertising.

46. An analogy is useful. A public IP address is like the number for a landline telephone for a household. A private IP address is like each handset that is connected to that landline number (*e.g.*, "Handset #1," "Handset #2"). Alot can be gleaned from knowing the phone number who is making the call, while knowing Handset #1 versus Handset #2 is making a call provides additional information.

47. The same is true of IP addresses. The public IP address divulges the approximate location of the user that is connecting to the Internet and the router directing those communications (presumably the user's house or workplace), and it is the means through which the user actually communicates with the website and the Internet at large. The private IP address then distinguishes between the devices accessing the same public IP address.[2]

/ / /

---

[2] While the Trackers do not collect private IP addresses, as discussed below, the Trackers also collect Device Metadata, which distinguishes between devices accessing the same public IP address. So, by installing the Trackers on Website users' browsers, Defendant allows third parties to collect information that is analogous to a telephone number (the public IP address) and the specific handset that is making the call (the "Device Metadata").

14

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**Figure 2**



*Each device on a network has a private IP address, and the router has a public IP address to communicate with the rest of the internet.*

48. Thus, the differences between public and private IP addresses are as follows:[3]

**Figure 3**

| Category | Private IP address | Public IP address |
|---|---|---|
| Scope | The private IP address only has a local scope in your own network. | The public IP address's scope is global. |
| Communication | It is used so devices within a network can communicate with each other. | It allows access to the internet and is used for communication outside of your own network. |
| Uniqueness | It's an address from a smaller range that's used by other devices in other local networks. | It's a unique address that's not used by other devices on the internet. |
| Provider | The router assigns a private IP address to a specific device on the local network. | The internet service provider assigns the public IP address. |
| Range | Private IP address ranges:<br><br>10.0.0.0 – 10.255.255.255,<br><br>172.16.0.0 – 172.31.255.255,<br><br>192.168.0.0 – 192.168.255.255 | Any IP address that isn't within a private IP address range. |

/ / /

---

[3] WHAT'S THE DIFFERENCE BETWEEN A PUBLIC AND PRIVATE IP ADDRESS?, AVIRA (Jan. 31, 2024), https://www.avira.com/en/blog/public-vs-private-ip-address.

49.     A public IP address is therefore "routing, addressing, or signaling information."   A public IP address functions as "routing, addressing, or signaling information" by facilitating internet communication. It provides essential information that can help determine the general geographic coordinates of a user accessing a website through geolocation databases. Additionally, a public IP address is involved in routing communications from the user's router to the intended destination, ensuring that emails, websites, streaming content, and other data reach the user correctly.

50.     As "routing, addressing, or signaling information," a public IP address is indispensable for maintaining seamless and efficient communication over the Internet. It ensures that data packets are sent from the user's router to the intended destination, such as a website or email server.

51.     A public IP address is "addressing" information because it determines the general geographic coordinates of the user who is accessing a website.

52.     A public IP address is "routing" or "signaling" information because it is sending or directing the user's communication from the router in their home or work to the website they are communicating with, and ensuring that "emails, websites, streaming content, and other data reaches you correctly."[4]

53.     Through a public IP address, a device's state, city, zip code, and approximate latitude and longitude can be determined.  Thus, knowing a user's public IP address and therefore geographical location "provide[s] a level of specificity previously unfound in marketing."[5]

54.     A public IP address allows advertisers to (i) "[t]arget [customers by] countries, cities, neighborhoods, and … postal code"[6] and (ii) "to target specific

---

[4] Anthony Freda, *Private IP vs Public IP: What's the Difference?*, AVG (June 4, 2021), https://www.avg.com/en/signal/public-vs-private-ip-address.
[5] *IP Targeting: Understanding This Essential Marketing Tool*, ACCUDATA (Nov. 20, 2023), https://www.accudata.com/blog/ip-targeting/.
[6] *Location-Based Targeting That Puts You in Control*, CHOOZLE, https://choozle.com/geotargeting-strategies/.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

households, businesses[,] and even individuals with ads that are relevant to their interests."[7]   Indeed, "IP targeting is one of the most targeted marketing techniques [companies] can employ to spread the word about [a] product or service"[8] because "[c]ompanies can use an IP address … to personally identify individuals."[9]

55.    In fact, a public IP address is a common identifier used for "geomarketing," which is "the practice of using location data to identify and serve marketing messages to a highly-targeted audience.  Essentially, geomarketing allows [websites] to better serve [their] audience by giving [them] an inside look into where they are, where they have been, and what kinds of products or services will appeal to their needs."[10]  For example, for a job fair in specific city, companies can send advertisements to only those in the general location of the upcoming event.[11]

56.    "IP targeting is a highly effective digital advertising technique that allows you to deliver ads to specific physical addresses based on their internet protocol (IP) address. IP targeting technology works by matching physical addresses to IP addresses, allowing advertisers to serve ads to specific households or businesses based on their location."[12]

57.    "IP targeting capabilities are highly precise, with an accuracy rate of over 95%. This means that advertisers can deliver highly targeted ads to specific households

---

[7] Herbert Williams, *The Benefits of IP Address Targeting for Local Businesses*, LINKEDIN (Nov. 29, 2023), https://tinyurl.com/c2ne77ua.

[8] *IP Targeting: Understanding This Essential Marketing Tool*, ACCUDATA (Nov. 20, 2023), https://www.accudata.com/blog/ip-targeting/.

[9] Trey Titone, *The Future Of IP Address As An Advertising Identifier*, AD TECH EXPLAINED (May 16, 2022), https://adtechexplained.com/the-future-of-ip-address-as-an-advertising-identifier/.

[10] *See, e.g.*, *The Essential Guide to Geomarketing: Strategies, Tips & More*, DEEP SYNC (Nov. 20, 2023), https://deepsync.com/geomarketing/.

[11] *See, e.g.*, *Personalize Your Website And Digital Marketing Using IP Address*, GEOFLI, https://geofli.com/blog/how-to-use-ip-address-data-to-personalize-your-website-and-digital-marketing-campaigns.

[12] *IP Targeting*, SAVANT DSP, https://www.savantdsp.com/ip-targeting?gad_source=1&gclid=Cj 0KCQjw1Yy5BhD-ARIsAI0RbXZJKJSqMI6p1xAxyqai1WhAiXRJTbX8qYhNuEvIfSCJ4jfOV 5-5maUaAgtNEALw_wcB.

or businesses, rather than relying on more general demographics or behavioral data."[13]

58.    In addition to "reach[ing] their target audience with greater precision," businesses are incentivized to use a customer's public IP address because it "can be more cost-effective than other forms of advertising."[14]  "By targeting specific households or businesses, businesses can avoid wasting money on ads that are unlikely to be seen by their target audience."[15]

59.    In addition, "IP address targeting can help businesses to improve their overall marketing strategy."[16]  "By analyzing data on which households or businesses are responding to their ads, businesses can refine their targeting strategy and improve their overall marketing efforts."[17]

60.    The collection of IP addresses here is particularly invasive here:  As a report from NATO found:

/ / /

/ / /

/ / /

---

[13] *Id.*
[14] Herbert Williams, *The Benefits of IP Address Targeting for Local Business*es, LINKEDIN (Nov. 29, 2023), https://www.linkedin.com/pulse/benefits-ip-address-targeting-local-businesses-herbert-willi ams-z7bhf.
[15] *Id.*
[16] *Id.*
[17] *Id.*

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

[a] data broker may receive information about a[] [website] user, including his … IP address.  The user then opens the [website] while his phone is connected to his home Wi-Fi network.  When this happens, the data broker can use the IP address of the home network to identify the user's home, and append this to the unique profile it is compiling about the user.  If the user has a computer connected to the same network, this computer will have the same IP address. The data broker can then use the IP address to connect the computer to the same user, and identify that user when their IP address makes requests on other publisher pages within their ad network.  Now the data broker knows that the same individual is using both the phone and the computer, which allows it to track behaviour across devices and target the user and their devices with ads on different networks.[18]

61.    In other words, not only does the collection of IP addresses by the Third Parties cause harm in and of itself, data brokers use IP addresses to identify users, append the IP address to a unique profile containing even more information about the user, attach specific IP addresses to comprehensive user profiles, and track Plaintiff and Class Members across the Internet using their IP addresses, compiling vast reams of other personal information in the process.

62.    For these reasons, under Europe's General Data Protection Regulation, IP addresses are considered "personal data, as they can potentially be used to identify an individual."[19]

/ / /

/ / /

---

[18] HENRIK TWETMAN & GUNDARS BERGMANIS-KORATS, NATO STRATEGIC COMMUNICATIONS CENTRE OF EXCELLENCE, DATA BROKERS AND SECURITY at 11 (2020), https://stratcomcoe.org/cuploads/pfiles/data_brokers_and_security_20-01-2020.pdf.

[19] IS AN IP ADDRESS PERSONAL DATA?, CONVESIO, https://convesio.com/knowledgebase/article/is-an-ip-address-personal-data/; *see also* WHAT IS PERSONAL DATA?, EUROPEAN COMMISSION, https://commission.europa.eu/law/law-topic/data-protection/reform/what-personal-data_en

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

63.     When companies build their websites, they install or integrate various third-party scripts into the code of the website in order to collect data from users or perform other functions.[20]

64.     Often times, third-party scripts are installed on websites "for advertising purposes."[21]

65.     Further, "[i]f the same third-party tracker is present on many sites, it can build a more complete profile of the user over time."[22]

66.     Defendant has long incorporated the Trackers' code into the code of its Website, including when Plaintiff and Class Members visited the Website.  Thus, when Plaintiff visited the Website, the Website caused the Trackers to be installed on Plaintiff's and other users' browsers.

67.     As described below, when a user visits the Website, the Website's code as programmed by Defendant installs the Trackers onto the user's browser.  This allows the Third Parties through their respective Trackers to collect Plaintiff's and Class Members' IP addresses, Device Metadata, and User Information, and pervasively track them across the Internet.

68.     Public IP addresses play a significant role in digital marketing by enabling geographic targeting based on a user's approximate location. Through IP geolocation services, advertisers can often determine a user's country, region, city, and in some cases, ZIP code or service area. In contexts where a static IP address is associated with a fixed residence or business, this data can contribute to household-level or business-level targeting, particularly when combined with other tracking identifiers and third-party enrichment.

---

[20] *See Third-party Tracking*, PIWIK, https://piwik.pro/glossary/third-party-tracking/ ("Third-party tracking refers to the practice by which a tracker, other than the website directly visited by the user, traces or assists in tracking the user's visit to the site. Third-party trackers are snippets of code that are present on multiple websites. They collect and send information about a user's browsing history to other companies…").
[21] *Id*.
[22] *Id*.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

69.     Defendant and the Third Parties then use the public IP addresses, Device Metadata, User Information, and other information of Website visitors that are collected and set by the Trackers, including those of Plaintiff and Class Members, to deanonymize Plaintiff and Class Members, serve hyper-targeted advertisements, and unjustly enrich themselves through this improperly collected information.  Defendant installs Trackers on users' browsers to collect User Information, including IP addresses and full URLs, which constitute outgoing routing and addressing metadata under CIPA. These identifiers serve the same function as telephony dialed numbers and therefore meet the statutory definition of a pen register or trap and trace device.

70.     At no time prior to the installation and use of the Trackers on Plaintiff's and Class Members' browsers, or prior to the use of the Trackers, did Defendant procure Plaintiff's and Class Members' consent for such conduct.  Nor did Defendant obtain a court order to install or use the Trackers.

**3.     *The Use of Pixel Trackers or Beacons and Digital Fingerprinting***

71.     Website users typically expect a degree of anonymity when browsing, particularly when they are not logged into an account. However, upon visiting the Website, Plaintiff's and Class Members' browsers executed third-party tracking scripts embedded by the Defendant. These Trackers operate in the background of the browsing session and collect detailed behavioral and technical information, which is then transmitted to external third-party servers without the users' active awareness.  These transmissions occurred silently, automatically, and without any visual indication to Plaintiff. No disclosure, banner, or mechanism alerted Plaintiff that his device would serve as a communication channel to multiple unrelated advertising and identity-resolution vendors.

72.     The third-party transmissions were triggered the moment Plaintiff's browser attempted to load each page, duplicating Plaintiff's outgoing GET and POST requests and routing those signals to multiple advertising and identity-resolution

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

endpoints before the requested pages finished loading or became visible on his device.

73.    The Trackers also causes additional data points to be sent from Plaintiff's and Class Members' browser to the Third Parties, which are meant to uniquely identify users across sessions and devices.  In addition to the public IP address, key elements include the user-agent string (browser, operating system, and device type) and device capabilities such as supported image formats and compression methods.  Persistent identifiers like the PUID, GUID, UID, PSVID, and User-Agent ensure users can be tracked even after clearing standard session data like cookies.  Advanced methods like fingerprinting and server-side matching remain unaffected by cookie deletion. Combined, these elements form a detailed, unique fingerprint that allows for cross-site tracking and behavioral profiling.

74.    This process, known as digital fingerprinting, involves compiling various data points such as browser version, screen resolution, installed fonts, device type, and language settings to generate a unique identifier for each user. Fingerprinting can be used to recognize repeat visits and correlate activity across different sessions or sites. When combined with form inputs, login activity, or third-party enrichment, fingerprinting can contribute to broader profiling of a user's interests, affiliations, or behaviors.

75.    When combined with additional tracking mechanisms such as cookies, login data, and third-party enrichment services, fingerprinting contributes to user profiling. This may include inferring location, browsing habits, consumer preferences, and potentially associating these patterns with known user identities. A sufficiently detailed digital fingerprint especially when correlated with other identifiers such as email addresses, form submissions, or third-party databases, can enable the reidentification of a user.

76.    The ability to associate a persistent digital profile with a specific individual using techniques such as digital fingerprinting has led to the development of a data industry known as identity resolution. Identity resolution involves recognizing users across sessions, devices, and platforms by connecting various identifiers derived from

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

their digital behavior, including IP addresses, browser metadata, cookies, and, in some cases, login credentials. The process may occur deterministically (based on known logins or user-submitted information) or probabilistically (based on behavioral or technical similarity).

77.    In simpler terms, pen register and trap and trace mechanisms, in the digital context, refer to technologies that record metadata such as IP addresses, URLs visited, and device characteristics, information that identifies the routing and addressing of electronic communications. This can be achieved through the deployment of tracking technologies like the Trackers installed, executed, embedded, or injected in the Website, which operate without user interaction or visibility.

78.    The Trackers provide analytics and marketing services to Defendant using the data collected from visitors to the Website when they visited the Website and from when they visited other websites that included the pen register and trap and trace devices.

79.    When users visit the Website, installed, executed, embedded or injected Trackers initiate network requests to third-party servers, using invisible image pixels, JavaScript calls, or beacon APIs. These requests include the user's IP address, which is transmitted automatically as part of the HTTP request header. In many cases, the Tracker's server responds by placing a persistent cookie in the user's browser, which serves as a unique identifier that can be used to recognize and track the user across future visits. If a user deletes their browser cookies, this identifier is removed. However, upon revisiting the Website, the process repeats: the browser executes the Tracker's script, a new identifier is set, and the Tracker resumes collecting the user's IP address and associated behavioral data.

/ / /

/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**4.** *Plaintiff And Class Members' Data Has Financial Value*

80.    Given the number of Internet users, the "world's most valuable resource is no longer oil, but data."[23]

81.    Consumers' web browsing histories have an economic value of more than $52 per year, while their contact information is worth at least $4.20 per year, and their demographic information is worth at least $3.00 per year.[24]

82.    There is a "a study that values users' browsing histories at $52 per year, as well as research panels that pay participants for access to their browsing histories."[25]

83.    Extracted personal data can be used to design products, platforms, and marketing techniques. A study by the McKinsey global consultancy concluded that businesses that "leverage customer behavior insights outperform peers by 85 percent in sales growth and more than 25 percent in gross margin."[26]

84.    In 2013, the Organization for Economic Cooperation and Development ("OECD") estimated that data trafficking markets had begun pricing personal data, including those obtained in illicit ways without personal consent. It found that illegal markets in personal data valued each credit cardholder record at between 1 and 30 U.S. dollars in 2009, while bank account records were valued at up to 850 U.S. dollars. Data brokers sell customer profiles of the sort that an online retailer might collect and maintain for about 55 U.S. dollars, and that individual points of personal data ranged in price from $0.50 cents for an address, $2 for a birthday, $8 for a social security number, $3 for a driver's license number, and $35 for a military record (which includes a birth date, an

---

[23] Ian Cohen, Are Web-Tracking Tools Putting Your Company at Risk?, Forbes (Oct 19, 2022), https://www.forbes.com/sites/forbestechcouncil/2022/10/19/are-web-tracking-tools-putting-your-company-atrisk/?sh=26481de07444

[24] *In re Facebook Internet Tracking Litig.*, 140 F. Supp. 3d 922, 928 (N.D. Cal. 2015), rev'd, 956 F.3rd 589 (9th Cir. 2020).

[25] *In re Facebook, Inc. Internet Tracking Litigation* (9th Cir. 2020) 956 F.3rd 589, 600.

[26] Brad Brown, Kumar Kanagasabai, Prashant Pant & Goncalo Serpa Pinto, Capturing value from your customer data, McKinsey (Mar. 15, 2017), https://www.mckinsey.com/businessfunctions/quantumblack/ourinsights/capturing-value-from-your-customer-data

24

identification number, a career assignment, height, weight, and other information). Experiments asking individuals in the United States and elsewhere how much they value their personal data points result in estimates of up to $6 for purchasing activity, and $150-240 per credit card number or social security number.[27]

85.    The last estimate probably reflects public reporting that identify theft affecting a credit card number or social security number can result in financial losses of up to $10,200 per victim.[28]

86.    Data harvesting is one of the fastest growing industries in the country, with estimates suggesting that internet companies earned $202 per American user in 2018 from mining and selling data. That figure is expected to increase with estimates for 2022 as high as $434 per use, reflecting a more than $200 billion industry.

87.    The Defendant's monetization of personal data constitutes actionable economic harm under federal law, even without evidence of a direct financial loss, as a "misappropriation-like injury" caused by converting user data into a revenue stream through targeted advertising. *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589 (9th Cir. 2020).

**5.    *Defendant Is Motivated To Monetize Consumer Information Regardless of Consent***

88.    By implementing Trackers on the Website, Defendant participates in building detailed behavioral profiles of visitors. These profiles include information such as which articles and content users viewed, how they navigated between topics, and what pages they interacted with. This data enables Defendant and its advertising partners to identify repeat visits from the same device or browser. This behavioral data is integrated

---

[27] Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value, OECD Digital Economy Papers, No. 220 (Apr. 2, 2013), at 27-28, https://www.oecdilibrary.org/docserver/5k486qtxldmq-en.pdf

[28] Bradley J. Fikes, Identity Theft Hits Millions, Report Says, San Diego Union Tribune, Sept. 4, 2003, https://www.sandiegouniontribune.com/sdut-identity-theft-hits-millions-report-says-2003sep04-story.html.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

into third-party advertising platforms, allowing Defendant to deliver retargeted ads to users who previously visited the Website, serve targeted content recommendations to users who showed engagement interest, and build "lookalike audiences" that target users with similar behaviors or characteristics. These practices significantly improve advertising efficiency and increase the likelihood of converting audience engagement into advertising revenue.

89.    Defendant has a strong financial incentive to deploy the Trackers on its Website without obtaining user consent. By enabling the collection of IP addresses and device-level identifiers through these technologies, Defendant facilitates integration into real-time bidding ecosystems. These systems rely on bidstream data such as IP address, device type, screen resolution, and referral information to assess the value of a potential ad impression. This enables Defendant and its partners to participate in data-driven ad targeting, increase the value of its advertising inventory, and track users across sessions and websites, all of which provide economic benefit despite the privacy implications to users.

90.    IP addresses are a valuable data point in digital advertising and tracking systems. They can be used to approximate a user's geographic location, often down to the city or ZIP code level, enabling location-based targeting. When combined with cookies, browser metadata, and device identifiers, IP addresses contribute to persistent user tracking across sessions and websites. They also assist advertisers and data brokers in linking anonymous browsing activity to existing user profiles, which enhances ad targeting precision and increases the commercial value of each tracked interaction. IP addresses therefore constitute "routing, addressing, or signaling information" protected under CIPA § 638.50(b).

91.    When users' data is collected without meaningful consent and monetized, they lose control over who can access, use, or distribute their personal information. Data brokers and ad tech firms aggregate and correlate identifiers such as IP addresses, device IDs, and cookies with other personal data to construct detailed consumer profiles.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

Information initially gathered in one context, such as browsing a retail website, is frequently repurposed for unrelated uses and sold to third parties without the user's awareness. This results in pervasive surveillance, where users are continuously tracked across multiple websites, applications, and devices, often without their knowledge or ability to opt out.

### 6. *Defendant's Conduct Constitutes An Invasion Of Plaintiff's And Class Members' Privacy*

92.    The collection of Plaintiff's and Class Members' personally identifying, de-anonymized information through Defendant's installation and use of the Trackers constitutes an invasion of privacy.

93.    As alleged herein, the Trackers are designed to conduct targeted advertising and boost Defendant's revenue, all through their surreptitious collection of Plaintiff's and Class Members' personal information.

94.    To put the invasiveness of Defendant's violations of the CIPA into perspective, it is also important to understand three concepts: data brokers, real-time bidding, and cookie syncing.

95.    In short, the import of these concepts is that: (i) the Third Parties are data brokers (or partner with data brokers) that collect user information from Website visitors to uniquely identify and de-anonymize users by combining their IP addresses, Device Metadata, User Information, and unique user ID values with whatever information those Third Parties have on a user from other sources; (ii) the Third Parties share that information with other entities to create the most complete user profile they can (through cookie syncing), which includes a more complete and non-anonymous portrait of the user; and (iii) those profiles are offered up for sale through the real-time bidding process to the benefit of Defendant and the Third Parties and to the detriment of users' privacy interests.

/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

### a. Data Brokers And Real-Time Bidding: The Information Economy
### *Data Brokers*

96.    While "[t]here is no single, agreed-upon definition of data brokers in United States law,"[29] California law defines a "data broker" as "a business that knowingly collects and sells to third parties the personal information of a consumer with whom the business does not have a direct [*i.e.*, consumer-facing] relationship," subject to certain exceptions.  Cal. Civ. Code § 1798.99.80(c).

97.    Any entity that qualifies as a "data broker" under California law must specifically register as such Cal. Civ. Code § 1798.99.82(a).

98.    "Data brokers typically offer pre-packaged databases of information to potential buyers," either through the "outright s[ale of] data on individuals" or by "licens[ing] and otherwise shar[ing] the data with third parties."[30]  Such databases are extensive, and can "not only include information publicly available [such as] from Facebook but also the user's exact residential address, date and year of birth, and political affiliation," in addition to "inferences [that] can be made from the combined data."[31]

99.    For instance, the NATO report noted that data brokers collect two sets of information: "observed and inferred (or modelled)."  The former "is data that has been collected and is actual," such as websites visited."  Inferred data "is gleaned from observed data by modelling or profiling," meaning what users may be *expected* to do.  On top of this, "[b]rokers typically collect not only what they immediately need or can

---

[29] JUSTIN SHERMAN, DUKE SANFORD CYBER POLICY PROGRAM, DATA BROKERS AND SENSITIVE DATA ON U.S. INDIVIDUALS: THREATS TO AMERICAN CIVIL RIGHTS, NATIONAL SECURITY, AND DEMOCRACY, at 2 (DUKE SANFORD CYBER POLICY PROGRAM, 2021), https://tinyurl.com/hy9fewhs.
[30] SHERMAN, *supra*, at 2.
[31] Tehila Minkus et al., *The City Privacy Attack: Combining Social Media and Public Records for Detailed Profiles of Adults and Children*, COSN '15: PROCEEDINGS OF THE 2015 ACM ON CONFERENCE ON ONLINE SOCIAL NETWORKS 71, 71 (2015), https://dl.acm.org/doi/pdf/10.1145/2817946.2817957.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

use, but hoover up as much information as possible to compile comprehensive data sets that might have some future use."[32]

100.  Likewise, a report by the Duke Sanford Cyber Policy Program "examine[d] 10 major data brokers and the highly sensitive data they hold on U.S. individuals."[33]  The report found that "data brokers are openly and explicitly advertising data for sale on U.S. individuals' sensitive demographic information, on U.S. individuals' political preferences and beliefs, on U.S. individuals' whereabouts and even real-time GPS locations, on current and former U.S. military personnel, and on current U.S. government employees."[34]

101.  This data collection has grave implications for Americans' right to privacy. For instance, "U.S. federal agencies from the Federal Bureau of Investigation [] to U.S. Immigration and Customs Enforcement [] purchase data from data brokers—without warrants, public disclosures, or robust oversight—to carry out everything from criminal investigations to deportations."[35]

102.  As another example:

> Data brokers also hold highly sensitive data on U.S. individuals such as race, ethnicity, gender, sexual orientation, immigration status, income level, and political preferences and beliefs (like support for the NAACP or National LGBTQ Task Force) that can be used to directly undermine individuals' civil rights.  Even if data brokers do not explicitly advertise these types of data (though in many cases they do), everything from media reporting to testimony by a Federal Trade Commission commissioner has identified the risk that data brokers use their data sets to make "predictions" or "inferences" about this kind of sensitive information (race, gender, sexual orientation, etc.) on individuals.
>
> …

---

[32] TWETMAN & BERGMANIS-KORATS, *supra*, at 11.
[33] SHERMAN, *supra*, at 1.
[34] *Id.*
[35] *Id.* at 9.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

> This data can be used by commercial entities within the U.S. to discriminately target goods and services, akin to how Facebook advertising tools allow advertisers to exclude certain groups, such as those who are identified as people with disabilities or those who are identified as Black or Latino, from seeing advertisements. Many industries from health insurance to life insurance to banking to e-commerce purchase data from data brokers to run advertisements and target their services.
>
> …
>
> Given identified discrimination problems in machine learning algorithms, there is great risk of these predictive tools only further driving up costs of goods and services (from insurance to housing) for minority groups.[36]

103.    Similarly, as the report from NATO noted, corporate data brokers cause numerous privacy harms, including but not limited to depriving users of the right to control who does and does not acquire their personal information, unwanted advertisements that can even go as far as manipulating viewpoints, and spam and phishing attacks.[37]

/ / /

/ / /

/ / /

---

[36] *Id.*
[37] TWETMAN & BERGMANIS-KORATS, *supra*, at 8.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**Figure 4**



104.   As noted above, data brokers are able to compile such wide swaths of information in part by collecting users' IP addresses, Device Metadata, and User Information, which is used by data brokers to track users across the Internet.[38]

105.   Indeed, as McAfee (a data security company) notes, "data brokers can … even place trackers or cookies on your browsers … [that] track your IP address and

---

[38] *Id.* at 11.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

browsing history, which third parties can exploit."[39]

106.   These data brokers will then:

> take that data and pair it with other data they've collected about
> you, pool it together with other data they've got on you, and then
> share all of it with businesses who want to market to you. They
> can eventually build large datasets about you with things like:
> "browsed gym shorts, vegan, living in Los Angeles, income
> between $65k-90k, traveler, and single."  Then, they sort you
> into groups of other people like you, so they can sell those lists
> of like-people and generate their income.[40]

107.   In short, by collecting IP addresses Device Metadata, and User Information, data brokers and many of the entities the Third Parties sync with can track users across the Internet, compiling various bits of information about users, building comprehensive user profiles that include an assortment of information, interests, and inferences, and offering up that information for sale to the highest bidder.  The "highest bidder" is a literal term, as explained below.

108.   As a result of Defendant's installation of trackers operated by data brokers and by numerous third parties with which those brokers synchronize, the information of Plaintiff and Class Members is linked to existing profiles maintained by those brokers, or used to generate new ones. This linkage occurs through the collection of IP addresses, device metadata, and other user information from the browsers of Defendant's Website visitors.

109.   These profiles are then served up to any companies that want to advertise on Defendant's Website, and Defendant's users become more valuable as a result of having their IP addresses, Device Metadata, and User Information linked to these data broker profiles.  Thus, Defendant is unjustly enriched through advertising revenue by installing the Trackers on Plaintiff's and Class Members' browsers, and thus, enabling

[39]  Jasdev Dhaliwal, *How Data Brokers Sell Your Identity*, MCAFEE (June 4, 2024), https://www.mcafee.com/blogs/tips-tricks/how-data-brokers-sell-your-identity/.
[40]  Paul Jarvis, *The Problem with Data Brokers: Targeted Ads and Your Privacy*, FATHOM ANALYTICS (May 10, 2022), https://usefathom.com/blog/data-brokers.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

the Third Parties to collect Plaintiff's and Class Members' IP addresses, Device Metadata, and User Information without consent.

### Real-Time Bidding

110.   Once data brokers and many of the entities the Third Parties sync with collect Website users' IP addresses, Device Metadata, and User Information, how do they "sell" or otherwise help Defendant monetize that information?  This is where real-time bidding comes in.

111.   "Real Time Bidding (RTB) is an online advertising auction that uses sensitive personal information to facilitate the process to determine which digital ad will be displayed to a user on a given website or application."[41]

112.   "There are three types of platforms involved in an RTB auction: Supply Side Platforms (SSPs), Advertising Exchanges, and Demand Side Platforms (DSPs)." An SSP work[s] with website or app publishers to help them participate in the RTB process."   "DSPs primarily work with advertisers to help them "[r]each relevant audiences on the open internet, drive growth, and prove your impact.."[42]   And an Advertising Exchange "allows advertisers and publishers to use the same technological platform, services, and methods, and 'speak the same language' in order to exchange data, set prices, and ultimately serve an ad."[43]

113.   In other words, SSPs provide user information to advertisers that might be interested in those users, the DSP is the platform on which all of this happens.

114.   The RTB process works as follows:

> After a user loads a website or app, an SSP will send user data to Advertising Exchanges … The user data, often referred to as "bidstream data," contains information like device identifiers, IP address, zip/postal code, GPS location, browsing history,

---

[41] Sara Geoghegan, *What is Real Time Bidding?*, ELECTRONIC PRIVACY INFORMATION CENTER (Jan. 15, 2025), https://epic.org/what-is-real-time-bidding/.

[42] *Id*.

[43] *Introducing To Ad Serving*, MICROSOFT IGNITE (Mar. 3, 2024), https://learn.microsoft.com/en-us/xandr/industry-reference/introduction-to-ad-serving.

location data, and more. After receiving the bidstream data, an Advertising Exchange will broadcast the data to several DSPs. The DSPs will then examine the broadcasted data to determine whether to make a bid on behalf of their client.

Ultimately, if the DSP wins the bid, its client's advertisement will appear to the user. Since most RTB auctions are held on the server/exchange side, instead of the client/browser side, the user only actually sees the winner of the auction and would not be aware of the DSPs who bid and lost. But even the losing DSPs still benefit because they also receive and collect the user data broadcasted during the RTB auction process. This information can be added to existing dossiers DSPs have on a user.[44]

**Figure 5**



115.    Facilitating this real-time bidding process means SSPs and DSPs must have as much information as possible about Defendant's users to procure the greatest interest from advertisers and the highest bids. These entities receive assistance because Defendant also installs the trackers of data brokers on its users' browsers:

/ / /

---

[44] Geoghegan, *supra*; *see also* REAL-TIME BIDDING, APPSFLYER, https://www.appsflyer.com/glossary/real-time-bidding/.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

the economic incentives of an auction mean that DSP [or SSP] with more specific knowledge of individuals will win desirable viewers due to being able to target them more specifically and out-bid other entities.  As a consequence, the bid request is not the end of the road. The DSP enlists a final actor, the data management platform (DMP) [or a data broker].  DSPs [or SSPs] send bid requests to DMPs [and data brokers], who enrich them by attempting to identify the user in the request and use a variety of data sources, such as those uploaded by the advertiser, collected from other sources, or bought from data brokers.  The DSP with the highest bid not only wins the right to deliver the ad—through the SSP—to the individual. The DSP also wins the right to cookie sync its own cookies with those from the [Advertising Exchange], thus enabling easier linkage of the data to the user's profile in the future.[45]

## **Figure 6**



116.   In other words, SSPs can solicit the highest bids for Website users by identifying and de-anonymizing those users by combining the information they know about that user with the information other data brokers know about that user.  If there is a match, then the SSPs will have significantly more information to provide about users, and that will solicit significantly higher bids from prospective advertisers (because the

---

[45] Michael Veale & Federik Zuiderveen Borgesius, *Adtech and Real-Time Bidding under European Data Protection Law*, 23 GERMAN L. J. 226, 232-33 (2022) https://tinyurl.com/yjddt5ey.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

advertisers will have more information about the user to target their bids).

117.   Likewise, a DSP can generate the highest and most targeted bids from advertisers by providing those advertisers with as much information about users as possible, which it does by syncing with data brokers who, in turn, sync with other data brokers and/or are data brokers themselves.

118.   All of this naturally enriches Defendant, as its users have now become more valuable thanks to the replete information the Third Parties are able to provide about users.

119.   As the Federal Trade Commission ("FTC") has noted, "[t]he use of real-time bidding presents potential concerns," including but not limited to:

> a.   "incentiviz[ing] invasive data-sharing" by "push[ing] publishers [*i.e.*, Defendant] to share as much end-user data as possible to get higher valuation for their ad inventory—particularly their location data and cookie cache, which can be used to ascertain a person's browsing history and behavior."
>
> b.   "send[ing] sensitive data across geographic borders."
>
> c.   sending consumer data "to potentially dozens of bidders simultaneously, despite only one of those parties—the winning bidder actually using that data to serve a targeted ad.  Experts have previously cautioned that there are few (if any) technical controls ensuring those other parties do not retain that data for use in unintended ways."[46]

120.   Given that certain Third Parties operate as DSPs here, the last point is particularly relevant, as it means those entities collect and disclose Website users' information to *all prospective advertisers*, even if advertisers do not ultimately show a

---

[46] FEDERAL TRADE COMMISSION, UNPACKING REAL TIME BIDDING THROUGH FTC'S CASE ON MOBILEWALLA (Dec. 3, 2024), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2024/12/unpacking-real-time-bidding-through-ftcs-case-mobilewalla.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

1  user an advertisement.  This greatly diminishes the ability of users to control their

2  personal information.

3       121.  Likewise, the Electronic Privacy Information Center ("EPIC") has warned

4  that "[c]onsumers' privacy is violated when entities disclose their information without

5  authorization or in ways that thwart their expectations."[47]

6       122.  For these reasons, some have characterized "real-time bidding" as "[t]he

7  biggest data breach ever recorded" because of the sheer number of entities that receive

8  personal information[48]:

9  **Figure 7**

10
11
12
13  
14
15
16
17
18
19
20
21

22       123.  All of this is in line with protecting the right to determine who does and

23  does not get to know one's information, a harm long recognized at common law and one

24  the CIPA was enacted to protect against.  *Ribas v. Clark*, 38 Cal. 3d 355 361 (1985)

25  (noting the CIPA was drafted with a two-party consent requirement to protect "the right

26

27  [47] Geoghegan, *supra*.

28  [48] DR. JOHNNY RYAN, "RTB" ADTECH & GDPR, https://assortedmaterials.com/rtb-evidence/ (video).

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

to control the nature and extent of the firsthand dissemination of [one's] statements");
*U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press* 489 U.S. 749, 763-64 (1989) ("[B]oth the common law and the literal understandings of privacy encompass the individual's control of information concerning his or her person.").

### Cookie Syncing

124.    It should now be clear both the capabilities of the Third Parties (*i.e.*, data brokers who de-anonymize users, or companies who sync with data brokers for this purpose) and the reasons Defendant installs their Trackers on its Website (to sell to advertisers in real-time bidding with as much information about users as possible to solicit the highest bids).   The final question is how do these Third Parties share information amongst each other and with others to offer the most complete user profiles up for sale?  This occurs through "cookie syncing."

125.    Cookie syncing is a process that "allow[s] web companies to share (synchronize) cookies, and match the different IDs they assign for the same user while they browse the web."[49]  This allows entities like the Third Parties to circumvent "the restriction that sites can't read each other cookies, in order to better facilitate targeting and real-time bidding."[50]

126.    Cookie syncing ("CSync") works as follows:

> Let us assume a user browsing several domains like website1.com and website2.com, in which there are 3rd-parties like tracker.com and advertiser.com, respectively. Consequently, these two 3rd-parties have the chance to set their own cookies on the user's browser, in order to re-identify the user in the future. Hence, tracker.com knows the user with the ID user123, and advertiser.com knows the same user with the ID userABC.

---

[49] Panagiotis Papadopoulos et al., *Cookie Synchronization: Everything You Always Wanted to Know But Were Afraid to Ask*, 1 WWW '19: THE WORLD WIDE WEB CONFERENCE 1432, 1432 (2019), https://dl.acm.org/doi/10.1145/3308558.3313542.

[50] Gunes Acar et al., *The Web Never Forgets: Persistent Tracking Mechanisms in the Wild*, 6B CCS'14: ACM SIGSAC CONFERENCE ON COMPUTER AND COMMUNICATIONS SECURITY 674, 674 (2014)

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

Now let us assume that the user lands on a website (say website3.com), which includes some JavaScript code from tracker.com but not from advertiser.com. Thus, advertiser.com does not (and cannot) know which users visit website3.com. However, *as soon as the code of tracker.com is called, a GET request is issued by the browser to tracker.com (step 1), and it responds back with a REDIRECT request (step 2), instructing the user's browser to issue another GET request to its collaborator advertiser.com this time, using a specifically crafted URL (step 3).*

…

When advertiser.com receives the above request along with the cookie ID userABC, it finds out that userABC visited website3.com. *To make matters worse, advertiser.com also learns that the user whom tracker.com knows as user123, and the user userABC is basically one and the same user.* Effectively, CSync enabled advertiser.com to collaborate with tracker.com, in order to: (i) find out which users visit website3.com, and (ii) *synchronize (i.e., join) two different identities (cookies) of the same user on the web.*[51]

/ / /

/ / /

/ / /

---

[51] Papadopoulos, *supra*, at 1433.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**Figure 8**



127.    Through this process, third party trackers are not only able to resolve user identities (*e.g.*, learning that who Third Party #1 knew as "userABC" and Third Party #2 knew as "user123" are the same person), they can "track a user to a much larger number of websites," even though that "do not have any collaboration with" the third party.[52]

128.    Conversely, "CSync may re-identify web users even after they delete their cookies."[53]  "[W]hen a user erases her browser state and restarts browsing, trackers usually place and sync a new set of userIDs, and eventually reconstruct a new browsing history."[54] But if a tracker can "respawn" its cookie or like to another persistent identifier (like an IP address), "then through CSync, all of them can link the user's browsing histories from before and after her state erasure.  Consequently: (i) users are not able to

---

[52] Papadopoulos, *supra*, at 1434.
[53] *Id*.
[54] *See id*.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

abolish their assigned userIDs even after carefully erasing their set cookies, and (ii) trackers are enabled to link user's history across state resets."[55]

129.   Thus, "syncing userIDs of a given user increases the user identifiability while browsing, thus reducing their overall anonymity on the Web."[56]

130.   The tracking activity at issue does not depend on users remaining anonymous. When the Trackers deployed on the Website execute within a user's browser, they assign and transmit persistent identifiers and related signaling data to their respective third-party operators as part of ordinary analytics, advertising, and session-measurement functions. As a result, the same browser or device can be recognized across multiple pageviews and visits to the Website by those third parties. This persistence allows third-party platforms to associate a user's browsing activity with an identifiable browser or device profile over time, thereby eliminating true anonymity during visits to the Website, even in the absence of account login or user-provided identifying information.

131.   To summarize the proceeding allegations, data brokers focus on collecting as much information about Website users as possible to create comprehensive user profiles, and the Trackers sync with numerous other data brokers that do the same.  The Third Parties collect IP addresses, Device Metadata, User Information, and unique user IDs in the first instance, but those pieces of information are connected to information the Third Parties glean from other sources (*e.g.*, various data brokers) to build comprehensive profiles.  Through "cookie syncing," those profiles are shared amongst the Third Parties and with other entities to form the most fulsome picture with the most attributes as possible.  And those profiles are offered up for sale to interested advertisers through real-time bidding using the Third Parties' trackers, where users will command more value the more advertisers know about a user.

---

[55] *Id.*
[56] *Id.* at 1441.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

132.   Thus, the Third Parties enrich the value Defendant's users would otherwise command by tying the data they obtain directly from users on the Website (*e.g.*, IP addresses, Device Metadata, User Information, unique user IDs) with comprehensive user profiles.

133.   Accordingly, Defendant is using the Trackers in conjunction with the Third Parties to (i) de-anonymize users, (ii) offer its users up for sale in real-time bidding, and (iii) monetize its Website by installing the Trackers and allowing the Third Parties to collect as much information about Website users as possible (without consent).

134.   Thus, Defendant is unjustly enriched through their installation and use of the Trackers, which causes data to be collected by Third Parties without Plaintiff's and Class Members' consent, and that enable the Third Parties to sell Defendant's user inventory in an ad-buying system.  In addition, Plaintiff and Class Members lose the ability to control their information, as their information ends up in the hands of data brokers, advertising inventory sellers, and a virtually unlimited number advertisers themselves without knowledge or consent.

135.   When a user visits the Website, a suite of background tracking technologies is activated immediately upon page load. These include client-side scripts deployed by third-party Trackers, which begin collecting various categories of User Information without any visible indication to the user. Together, these technologies function as a coordinated data collection infrastructure that allows Defendant to analyze user behavior at a highly granular level and to leverage that insight in real time for marketing optimization, user targeting, and business intelligence.

136.   On information and belief, the Trackers operate as part of a vast and interconnected digital advertising ecosystem and these entities leverage shared identifiers, cookie syncing, and cross-device tracking techniques to follow users across websites, platforms, and environments, with tools specifically engineered to build persistent consumer profiles, enabling real-time behavioral targeting and identity resolution at scale.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

137.    Defendant deploys the Trackers to build a behavioral profiling and targeted advertising system. Several of these trackers are dynamically injected into the Website through tag management systems, initiating the collection of user behavior such as pageviews, navigation patterns, and session metadata. Others are directly embedded into the Website's code, firing automatically upon page load. Together, these technologies associate user behavior with device identifiers, cookies, and pseudonymous advertising IDs, facilitating the construction of persistent user profiles for advertising and marketing purposes.

138.    The Trackers participate in programmatic advertising ecosystems by capturing behavioral signals from the Website and linking them to advertising audiences. These trackers enable personalized ad delivery based on users' site interactions and associate browsing activity with broader ad networks through identifier syncing. Each of these platforms sets or reads cookies to maintain persistent tracking across sessions and domains, effectively participating in workflows designed to reidentify users and expand behavioral audience segments for targeted advertising.

139.    In addition to the Trackers identified above, Plaintiff's browsing session on the Website triggered connections to additional third-party advertising and data-collection infrastructure, including domains operated by DoubleVerify (ad verification and impression tracking), AppNexus/Xandr (real-time bidding exchange), Casale Media (advertising network), BlueCava/Oracle Data Cloud (identity resolution and cookie syncing), Samplicio/Lucid (behavioral tracking and survey targeting), and AdMaster/MediaGo (advertising performance tracking).

## 7.    *Data Categorization*

140.    Plaintiff's claims under California Penal Code §§ 631 and 638.51 are based on distinct categories of data. Plaintiff's § 631 claim is based on the interception of content-bearing information, specifically full page URLs and/or search terms that reveal the substance and meaning of Plaintiff's communications with the Website. Plaintiff's § 638.51 claim is based on the capture of dialing, routing, addressing, and signaling

43

information, specifically IP addresses, device identifiers, timestamps, referrer headers, and session identifiers. These claims are not pleaded in the alternative; they address different data elements and different statutory violations arising from the same course of conduct.

141.   Content-bearing data, as used herein, refers to information transmitted as named parameters in the request body or query string that identifies the substance of what the user was viewing. Examples include the dl= parameter (document location URL), the dt= parameter (document title), and similar payload fields that carry the full human-readable URL of the information searched and/or page the user accessed. These parameters reveal the specific content of the user's communication with the Website.

142.   Dialing, routing, addressing, and signaling information, as used herein, refers to non-content data transmitted as part of the communication's routing infrastructure. This includes IP addresses, device identifiers, timestamps, referrer headers transmitted in HTTP headers, User-Agent strings, session identifiers, persistent cookies, and DNS queries. These data elements identify the source, destination, and technical characteristics of the communication without revealing its substance.

143.   The same tracker may transmit both categories of data simultaneously. For example, when the Google Tracker fires, it transmits the user's page URL as a payload parameter (content) and the user's IP address as part of the HTTP request header (DRAS). Plaintiff's § 631 claim targets only the content-bearing payload data; Plaintiff's § 638.51 claim targets only the non-content DRAS elements. No data element is pleaded as both content and DRAS.

## V.    SPECIFIC ALLEGATIONS

144.   **Figure 9** is a DevTools Network panel capture showing the chronological sequence and duration of HTTP requests during Plaintiff's page load, showing the document request to the Website and the identified third-party tracking domains. Requests to analytics.google.com, securepubads.g.doubleclick.net, and sb.scorecardresearch.com initiate and complete while the browser was still receiving and

rendering the webpage Plaintiff requested.

**Figure 9**



145. Under the HTTP protocol, a server must parse the contents of an incoming request in order to generate a response. The HTTP 200 and 204 status codes returned by Google and Comscore servers during the page-loading sequence depicted above confirm that each server received, parsed, and processed the content-bearing URLs transmitted

45

by Plaintiff's browser. Because these requests were initiated and responses received while the browser was still receiving and rendering the webpage Plaintiff requested, the third parties' servers read and/or attempted to learn the contents of Plaintiff's communication while that communication remained in transit.

### 1.   The Google Trackers

146.   The Website embeds Google Analytics (GA4), Google Tag Manager (GTM), Google Ads, and DoubleClick tracking technologies on the Website (collectively, the "Google Trackers"). The Google Trackers automatically execute upon page load and cause the user's browser to simultaneously transmit two categories of information to Google-controlled servers: (a) content-bearing data, specifically full page URLs carried in the dl parameter of Google Analytics collection requests and in the query strings of Google Ads/DoubleClick event calls, identifying the substance of the user's communication with the Website; and (b) non-content dialing, routing, addressing, and signaling information, including the _ga persistent client identifier, the _gid session identifier, the _gcl_au Google Ads conversion linker identifier, referrer headers, screen resolution, viewport dimensions, and browser language settings.

147.   **Figure 10** is a Chrome DevTools Network Payload capture showing a request from Plaintiff's browser to securepubads.g.doubleclick.net/gampad/ads during Plaintiff's visit to an article page on the Website. The Payload tab displays the url= parameter containing the full article URL https://www.psychologytoday.com/us/basics/low-sexual-desire, the ref= parameter containing the prior search query URL https://www.psychologytoday.com/us/archive?search=Low+sexual+drive+in+young+women, and the cust_params= parameter containing content classification metadata including SpecialCat, BlogId, PageId, and NodeType values. Device and screen parameters are also visible in the request.

/ / /

**Figure 10**



148.    **Figure 11** is a Fiddler Classic WebForms capture showing the parsed query string parameters of a Google Analytics collection request transmitted to analytics.google.com/g/collect. The WebForms table displays the dl= parameter containing the full search query URL https://www.psychologytoday.com/us/archive?search=Low+sexual+drive+in+young+women, the sr parameter (screen resolution), the ul parameter (browser language), the cid parameter (client identifier), and the dt parameter showing the page title. The tid parameter shows the GA4 property identifier G-5EMHF6S1M6. The request also includes a Referer header pointing to https://www.psychologytoday.com, and a complete User-Agent string describing the browser and operating system.

/ / /

/ / /

47

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**Figure 11**



149.  **Figure 12** is a Wireshark DNS capture showing DNS queries and responses resolving Google-controlled domains, including analytics.google.com, www.google-analytics.com, www.googletagmanager.com, pagead2.googlesyndication.com, and safeframe.googlesyndication.com, with returned A records used for routing. This confirms off-site network routing to Google infrastructure at the DNS layer.

/ / /

/ / /

/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED



**Figure 12**



150. **Figure 13** is a Chrome DevTools Application panel capture showing cookies stored in the browser during Plaintiff's visit to the Website, including the _ga and _ga_5EMHF6S1M6 analytics identifier cookies associated with the google.com domain, and the APC DoubleClick advertising identifier cookie associated with the .doubleclick.net domain. These cookies contain persistent identifier values assigned by Google's tracking infrastructure, already present when the content-bearing URLs in Figures 10 and 11 were transmitted.

/ / /

/ / /

/ / /

49

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**Figure 13**



151.   Figure 10 shows the DoubleClick advertising request firing automatically during page load, transmitting the article URL https://www.psychologytoday.com/us/basics/low-sexual-desire in the url= parameter, the prior search query URL https://www.psychologytoday.com/us/archive?search=Low+sexual+drive+in+young+women in the ref= parameter, and content classification metadata in the cust_params= parameter to Google's advertising infrastructure. Figure 11 confirms that a parallel Google Analytics collection request carries the full search query URL https://www.psychologytoday.com/us/archive?search=Low+sexual+drive+in+young+women in the dl= parameter, along with the GA4 property identifier G-5EMHF6S1M6, the client identifier, and device context, proving that Google receives content-bearing browsing data through both its advertising and analytics pipelines. Figure 12 establishes that the browser resolves Google's tracking domains to Google-operated IP infrastructure, completing the routing chain from the user's device to Google's servers. Figure 13 confirms that Google's persistent tracking cookies,  including the _ga

50

identifier with a two-year duration, were already present on Plaintiff's browser at the time of these transmissions, establishing that Google received the content-bearing URLs linked to a pre-existing, longitudinally tracked browser identity. Together, these four figures trace the Google Trackers' operation from automatic code execution on the user's browser, through the transmission of article-level URLs and persistent device identifiers, to delivery at Google-controlled advertising and analytics endpoints.

152.    The Google Trackers executed automatically upon page load. The embedded analytics and advertising scripts caused Plaintiff's browser to generate and transmit content-bearing URLs to Google's servers during the page-loading process itself, before the page finished rendering and before any consent mechanism was presented. No user authorization or court order preceded these transmissions.

153.    The following URLs, revealing the substance of Plaintiff's private browsing activity, were transmitted to Google through the Google Trackers:

- https://www.psychologytoday.com/us/archive?search=Low+sexual+drive+in+young+women
- https://www.psychologytoday.com/us/basics/low-sexual-desire
- https://www.psychologytoday.com/us/blog/liking-the-child-you-love/201910/3-reasons-why-women-may-lose-sexual-desire
- https://www.psychologytoday.com/us/blog/compassion-matters/201306/misconceptions-about-a-womans-sexuality
- https://www.psychologytoday.com/us/archive?search=low+sex+frequency+in+couples
- https://www.psychologytoday.com/us/blog/all-about-sex/202205/how-deal-couples-most-common-sexual-concern

154.    These URLs disclose the substance of Plaintiff's communications with the Website: that Plaintiff accessed specific content on the Website. Google, an independent entity with its own advertising, profiling, and measurement interests, received this content via Google Analytics collection and DoubleClick advertising events transmitted

51

contemporaneously with page load. As depicted in Figure 9, the Google Tracker requests were initiated and completed while the browser was still receiving and rendering the webpage Plaintiff requested, that is, while Plaintiff's communication with the Website remained in transit.

155. The content-bearing URLs transmitted via the Google Trackers were not transmitted anonymously. As shown in Figure 13, the _ga persistent cookie was already present on Plaintiff's browser at the time of the browsing session, containing a unique identifier value assigned by Google. The Google Trackers transmitted the content-bearing URLs in the same collection requests as the cid parameter derived from this pre-existing _ga cookie, linking the content of Plaintiff's communications to a longitudinal profile Google maintains for that browser across all websites deploying Google Analytics. Google did not receive anonymous page views; it received content-bearing URLs attributed to a specific, persistently tracked browser identity. Google participates in cookie synchronization through cm.g.doubleclick.net, exchanging its identifiers with other advertising platforms. During Plaintiff's browsing session, the network traffic captures records cookie synchronization requests executing between Google's DoubleClick infrastructure and other ad tech platforms, propagating the linkage between Plaintiff's Google-assigned identity and the intercepted content across multiple independent companies participating in the identity resolution network described above.

156. Google did not merely receive these transmissions passively. The Chrome DevTools Network panel captured during the forensic examination shows HTTP 200 responses in the Status column for each Google tracking request, confirming that Google's servers received and actively responded to the transmissions. The Google Analytics collection endpoint returned an HTTP 204 No Content response to the GA4 request                                                                                      containing https://www.psychologytoday.com/us/archive?search=Low+sexual+drive+in+young+ women. A 204 is an explicit server acknowledgment that the transmitted data was received and processed, with no content to return. This is affirmative evidence that

Google's servers contemporaneously processed the transmitted article URL. The Referer headers in Figures 10 and 11 show https://www.psychologytoday.com/, proving the browser remained on Psychology Today page, and therefore the communication remained in transit, when Google received and processed the data. During the same browsing session, the network traffic captures records cookie synchronization requests to cm.g.doubleclick.net firing immediately after the GA4 and DoubleClick tracking requests, demonstrating that Google acted on the received data by initiating cross-platform identity matching with other advertising infrastructure. These server-side processing confirmations and downstream synchronization actions constitute reading the contents of Plaintiff's communication within the meaning of California Penal Code § 631.

157.    By embedding the Google Trackers on the Website, Defendant aided, agreed with, employed, and conspired with Google to intercept the contents of Plaintiff's and Class Members' communications while in transit, and Google read and used information so obtained, in violation of California Penal Code § 631(a). Google is a third party to Plaintiff's communication with the Website, and it used the intercepted content for its own advertising, profiling, and measurement purposes independent of the Website's operation.

158.    The Google Trackers constitute both a "process" and a "device" under California Penal Code § 638.51: they are software mechanisms that automatically capture and transmit signaling data to a third party (process), and they execute on users' hardware, consuming processing resources and network bandwidth (device). James v. Walt Disney Co., 2023 WL 7392285, at *13 (N.D. Cal. Nov. 8, 2023).

159.    The non-content DRAS information captured by the Google Trackers includes the _ga persistent client identifier, the _gid session identifier, the _gcl_au conversion linker identifier, referrer headers, screen resolution, viewport dimensions, browser language, and session timestamps. Plaintiff's § 631 claim targets the content-bearing URLs transmitted in the dl parameter and DoubleClick query strings; Plaintiff's

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

§ 638.51 claim targets these non-content DRAS elements.

160.  Defendant did not obtain a court order authorizing the installation or use of a pen register or trap-and-trace device or process and did not obtain Plaintiff's or the Class Members' consent for the deployment of the Google Trackers. The Google Trackers execute automatically at page load, before any consent mechanism is presented to the user.

161.  By embedding the Google Trackers and causing Plaintiff's content-bearing URLs to be transmitted to and read by Google while in transit, Defendant violated California Penal Code § 631.

162.  By embedding the Google Trackers and causing Plaintiff's non-content DRAS information to be transmitted to Google, Defendant separately violated California Penal Code § 638.51.

### 2.  *Comscore/Scorecard Research*

163.  The Website embeds Scorecard Research tracking beacons operated by Comscore, Inc. ("Comscore"), which automatically execute upon page load. As configured, these beacons simultaneously collect and transmit two categories of information to Comscore-controlled servers at sb.scorecardresearch.com: (a) content-bearing data, specifically full page URLs and page titles identifying the substance of the user's communication with the Website, carried in the c7 (current page URL), c8 (page title), and c9 (prior page URL) parameters of Scorecard Research beacon requests; and (b) non-content dialing, routing, addressing, and signaling information, including the XID persistent identifier cookie, the UID cookie, referrer headers, and session timestamps.

164.  **Figure 14** is a Chrome DevTools Network Payload capture showing a request from Plaintiff's browser to sb.scorecardresearch.com/p during Plaintiff's visit to a search results page on the Website. The Payload tab displays the c7= parameter containing the full search query URL https://www.psychologytoday.com/us/archive?search=low+sex+frequency+in+couples

, the c8= parameter containing the page title, and the c9= parameter containing the prior search query URL. The c2= parameter shows the Comscore site identifier 38584006. Persistent identifier cookies including XID and UID are transmitted in the same request.

**Figure 14**



165.    **Figure 15** is a Fiddler Classic WebForms capture showing the parsed query string parameters of a Scorecard Research beacon request transmitted to sb.scorecardresearch.com. The WebForms table displays the c7= parameter containing the full article URL https://www.psychologytoday.com/us/blog/all-about-sex/202205/how-deal-couples-most-common-sexual-concern, the c8= parameter containing the human-readable page title, and the c2= parameter showing the Comscore site identifier 38584006. The request includes referrer and user-agent headers describing the browser and operating system.

/ / /

/ / /

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**Figure 15**



166.  **Figure 16** is a Wireshark DNS capture showing DNS queries and responses resolving Comscore-controlled domains, including sb.scorecardresearch.com, with returned A records used for routing. This confirms off-site network routing to Comscore infrastructure at the DNS layer.

**Figure 16**



56

167. **Figure 17** is a Chrome DevTools Application panel capture showing cookies stored in the browser during Plaintiff's visit to the Website, including the XID and GUID persistent identifier cookies associated with the www.scorecardresearch.com domain. These cookies contain persistent identifier values assigned by Comscore's tracking infrastructure, already present when the content-bearing URLs in Figures 14 and 15 were transmitted.

**<u>Figure 17</u>**



168. Figure 14 shows that the Scorecard Research beacon request firing automatically during page load, transmitting the search query URL https://www.psychologytoday.com/us/archive?search=low+sex+frequency+in+couples in the c7= parameter, the page title in the c8= parameter, and the prior search query URL in the c9= parameter, along with persistent identifier cookies, to Comscore's measurement endpoint. Figure 15 confirms that a subsequent beacon request carries the article URL https://www.psychologytoday.com/us/blog/all-about-sex/202205/how-deal-couples-most-common-sexual-concern in the c7= parameter and the page title in the c8= parameter, proving that Comscore receives content-bearing browsing data across multiple page visits. Figure 16 establishes that the browser resolves Comscore's tracking

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

domain to Comscore-operated IP infrastructure, completing the routing chain from the user's device to Comscore's servers. Figure 17 confirms that Comscore's persistent tracking cookies, including the XID identifier, were already present on Plaintiff's browser at the time of these transmissions, establishing that Comscore received the content-bearing URLs linked to a pre-existing, persistently tracked browser identity. Together, these four figures trace the Scorecard Research beacons' operation from automatic code execution on the user's browser, through the transmission of page-level URLs, search query URLs, and persistent device identifiers, to delivery at Comscore-controlled audience measurement endpoints.

169.   The Scorecard Research beacons executed automatically upon page load. The embedded beacon scripts caused Plaintiff's browser to generate and transmit content-bearing URLs to Comscore's servers during the page-loading process itself, before the page finished rendering and before any consent mechanism was presented. No user authorization or court order preceded these transmissions.   As depicted in Figure 9, the Scorecard Research beacon requests were initiated and completed while the browser was still receiving and rendering the webpage Plaintiff requested — that is, while Plaintiff's communication with the Website remained in transit.

170.   The following URLs, revealing the substance of Plaintiff's private browsing activity, were transmitted to Comscore through the Scorecard Research beacons:

- https://www.psychologytoday.com/us/archive?search=Low+sexual+drive+in+young+women
- https://www.psychologytoday.com/us/basics/low-sexual-desire
- https://www.psychologytoday.com/us/blog/liking-the-child-you-love/201910/3-reasons-why-women-may-lose-sexual-desire
- https://www.psychologytoday.com/us/blog/compassion-matters/201306/misconceptions-about-a-womans-sexuality

///

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

- https://www.psychologytoday.com/us/archive?search=low+sex+frequenc
  y+in+couples
- https://www.psychologytoday.com/us/blog/all-about-sex/202205/how-
  deal-couples-most-common-sexual-concern

171.   These URLs disclose the substance of Plaintiff's communications with the Website: that Plaintiff accessed specific content on the Website. Comscore, an independent entity with its own audience measurement and data licensing interests, received these content-bearing URLs via Scorecard Research beacon events transmitted contemporaneously with page load.

172.   The content-bearing URLs transmitted via the Scorecard Research beacons were not transmitted anonymously. As shown in Figure 17, the XID persistent cookie was already present on Plaintiff's browser at the time of the browsing session, containing a unique identifier value assigned by Comscore. The Scorecard Research beacons transmitted the content-bearing URLs in the same beacon requests as this pre-existing identifier, linking the content of Plaintiff's communications to a persistent profile Comscore maintains for that browser across all websites deploying Scorecard Research. Comscore did not receive anonymous page views; it received content-bearing URLs attributed to a specific, persistently tracked browser identity. As alleged in the General Allegations, Comscore participates in the digital advertising ecosystem as an audience measurement and data analytics provider, aggregating browsing behavior across its publisher network to create audience segments licensed to advertisers, agencies, and media buyers.

173.   Comscore did not merely receive these transmissions passively. The Chrome DevTools Network panel captured during the forensic examination shows HTTP 200 responses for each Scorecard Research beacon request, confirming that Comscore's servers received and actively responded to the transmissions containing the content-bearing URLs. Comscore's audience measurement platform processes the transmitted URLs to classify page content, assign audience segments, and generate

cross-publisher behavioral analytics. The c8= parameter (page title) and c7= parameter (full page URL) are parsed to evaluate the substance of the user's browsing activity and categorize it for audience measurement reporting. The Referer headers in Figures 14 and 15 show https://www.psychologytoday.com/, proving the browser remained on the Psychology Today page, and therefore the communication remained in transit, when Comscore received and processed the data. This server-side processing and content evaluation constitutes reading the contents of Plaintiff's communication within the meaning of California Penal Code § 631.

174.    By embedding the Scorecard Research beacons on the Website, Defendant aided, agreed with, employed, and conspired with Comscore to intercept the contents of Plaintiff's and Class Members' communications while in transit, and Comscore read and used information so obtained, in violation of California Penal Code § 631(a). Comscore is a third party to Plaintiff's communication with the Website, and it used the intercepted content for its own audience measurement, data licensing, and analytics purposes independent of the Website's operation.

175.    The Scorecard Research beacons constitute both a "process" and a "device" under California Penal Code § 638.51: they are software mechanisms that automatically capture and transmit signaling data to a third party (process), and they execute on users' hardware, consuming processing resources and network bandwidth (device). James v. Walt Disney Co., 2023 WL 7392285, at *13 (N.D. Cal. Nov. 8, 2023).

176.    The non-content DRAS information captured by the Scorecard Research beacons includes the XID persistent identifier cookie, the UID cookie, referrer headers, and session timestamps. Plaintiff's § 631 claim targets the content-bearing URLs and page titles transmitted in the c7, c8, and c9 parameters; Plaintiff's § 638.51 claim targets these non-content DRAS elements.

177.    Defendant did not obtain a court order authorizing the installation or use of a pen register or trap-and-trace device or process and did not obtain Plaintiff's or the Class Members' consent for the deployment of the Scorecard Research beacons. The

1  Scorecard Research beacons execute automatically at page load, before any consent
2  mechanism is presented to the user.

3      178.   Comscore's own technical documentation confirms that this reading occurs
4  by design. According to the Comscore Tag Specification for Media Metrix Reporting
5  (document version 2.9.0, © 2023 Comscore), the Scorecard Research tag operates
6  through a two-step process: first, the publisher's web page requests and loads a
7  JavaScript file (beacon.js) from sb.scorecardresearch.com; second, upon execution, the
8  JavaScript code of the tag automatically reads the current page URL, page title, and
9  referring URL directly from the user's browser and transmits those values to Comscore's
10 servers as query string parameters. The Tag Specification states that the parameters c7
11 (Full Page URL), c8 (Page Title), and c9 (Referring URL) are "automatically collected
12 by the JavaScript code of the tag." The Tag Specification further states: "Each time the
13 content asset is served upon the end-consumer, the tag call is made and that consumption
14 event is logged on the data collection server." The JavaScript code thus reads the
15 contents of Plaintiff's communication, which are the sensitive, content-bearing URLs
16 identifying the specific Psychology Today pages Plaintiff was viewing,  at the moment
17 the script executes in Plaintiff's browser during the page-loading process, before the
18 beacon request is transmitted to and acknowledged by Comscore's server.   The
19 Comscore    Tag    Specification    can    be    found
20 here:    https://www.scribd.com/document/882979941/Comscore-Tag-Specification-
21 Web-Page-impressions.

22     179.   Comscore/ScorecardResearch's own Privacy Policy (last updated October
23 28, 2025) confirms the nature and scope of this reading. The Privacy Policy states that
24 ScorecardResearch Tags "collect information about your use of those services,"
25 including "Internet or other electronic network activity including information about your
26 browsing history." The Privacy Policy further states that "[e]xamples of information we
27 collect within the categories above are the content that you view on the websites you
28 visit." ScorecardResearch also acknowledges that it "collect[s] data that reveals or from

61

which [it] could derive the following categories of sensitive personal information," including "mental or physical condition or diagnosis, sex life or sexual orientation." These admissions confirm that Comscore reads and evaluates the substance of the content-bearing URLs transmitted by its beacons,  including the sexuality-themed Psychology Today URLs transmitted in the c7= and c9= parameters identified in Figures 14 through 17,  and uses that content to derive sensitive inferences about the individuals whose browsing activity is captured.  The Comscore Privacy Policy can be found here:  https://www.scorecardresearch.com/privacy.aspx.

180.   By embedding the Scorecard Research beacons and causing Plaintiff's content-bearing URLs to be transmitted to and read by Comscore while in transit, Defendant violated California Penal Code § 631.

181.   By embedding the Scorecard Research beacons and causing Plaintiff's non-content DRAS information to be transmitted to Comscore, Defendant separately violated California Penal Code § 638.51.

## VI.    CLASS ALLEGATIONS

182.   Plaintiff brings this action individually and on behalf of a class of similarly situated persons (the "Class"), pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3). Two subclasses are defined below. No data element is pleaded as both content and DRAS. Membership in one subclass does not exclude membership in the other.

> All persons within California whose browser was subject to installation, execution, embedding, or injection of the Trackers by the Defendant's Website during the relevant statute of limitations period.

183.   Within the Class, Plaintiff defines two subclasses:

- **§ 631 Subclass (Content Interception Subclass):** All Class Members whose browsers transmitted content-bearing URLs — specifically, full page URLs identifying the substance of the user's communication with the

Website — to Google (via the Google Trackers) and/or Comscore (via Scorecard Research tracking beacons) as a result of the operation of these trackers on the Website.

- **§ 638.51 Subclass (Pen Register / Trap-and-Trace Subclass):** All Class Members whose browsers transmitted non-content dialing, routing, addressing, and signaling information — including IP addresses, persistent cookie identifiers, device and browser metadata, referrer headers, and session timestamps — to any of the third-party tracker operators identified in this Complaint as a result of the operation of the Trackers on the Website.

184. **NUMEROSITY:** Plaintiff does not know the number of Class Members but believes the number to be in the thousands, if not more. The exact identities of Class Members can be ascertained by the records maintained by Defendant.

185. **COMMONALITY:** Common questions of fact and law exist as to all Class Members and predominate over any questions affecting only individual members of the Class. Such common legal and factual questions, which do not vary between Class members, and which may be determined without reference to the individual circumstances of any Class Member, include but are not limited to the following:

- Whether Defendant installed, executed, embedded, or injected the Trackers on the Website;
- Whether the Trackers are each a pen register and/or trap and trace device as defined by law;
- Whether Defendant implemented the Trackers to read or to attempt to learn human readable communication content in transit;
- Whether Plaintiff and Class Members are subject to same tracking policies and practices;
- Whether Defendant violated CIPA;
- Whether Plaintiff and Class Members are entitled to statutory damages;
- Whether Class Members are entitled to injunctive relief;

63

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

- Whether the Defendant's conduct violates the California Constitution;
- Whether the Defendant's conduct constitutes an intrusion upon seclusion;
- Whether the Defendant's conduct constitutes an unlawful, misleading, deceptive or fraudulent business practice; and
- Whether Class Members are entitled to disgorgement of data unlawfully obtained.

186.   **TYPICALITY:**  As a person who visited Defendant's Website and whose outgoing electronic information was surreptitiously collected by the Trackers, Plaintiff is asserting claims that are typical of the Class Members. Plaintiff's experience with the Trackers is typical to Class Members.

187.   **ADEQUACY:**  Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained attorneys experienced in class action litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the Class or whose inclusion would otherwise be improper are excluded.

188.   **SUPERIORITY:** A class action is superior to other available methods of adjudication because individual litigation of the claims of all Class Members is impracticable and inefficient. Even if every Class Member could afford individual litigation, the court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed. Individualized litigation also presents a potential for inconsistent or contradictory judgments.

## VII.   <u>FIRST CAUSE OF ACTION</u>

### Violations of Cal. Penal Code § 638.51

### *By Plaintiff and the Class Members Against All Defendants*

189.   Plaintiff reasserts and incorporates by reference the allegations set forth in each preceding paragraph as though fully set forth herein, except to the extent any such allegation characterizes full page URLs or search terms as contents rather than dialing, routing, addressing, or signaling information.

64

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

190.   Plaintiff brings this cause of action individually and on behalf of the members of the proposed Class against Defendant.

191.   Defendant uses a pen register device or process and/or a trap and trace device or process on its Website by deploying the Trackers because the Trackers are designed to capture the IP address, User Information, and other information such as the phone number, email, routing, addressing and/or other signaling information of website visitors.

192.   The Trackers recorded Plaintiff's dialing, routing, addressing, and signaling information in real time, automatically transmitting this dialing, routing, addressing and signaling data to multiple third-party ad-tech endpoints before the Webpage fully loaded.

193.   Defendant did not obtain consent from Plaintiff or any of the Class Members before using pen registers or trap and trace devices to locate or identify users of its Website and has thus violated CIPA. CIPA imposes civil liability and statutory penalties for violations of § 638.51. Cal. Penal Code § 637.2; *Moody v. C2 Educational Systems, Inc.*, No. 2:24-cv-04249-RGK-SK, 2024 U.S. Dist. LEXIS 132614 (C.D. Cal. July 25, 2024).

## VIII.  <u>SECOND CAUSE OF ACTION</u>

### Violations of Cal. Penal Code § 631

### *By Plaintiff and the Class Members Against All Defendants*

194.   Plaintiff reasserts and incorporates by reference the allegations set forth in each preceding paragraph as though fully set forth herein, except to the extent any such allegation characterizes full page URLs or search terms as dialing, routing, addressing, or signaling information rather than contents.

195.   Plaintiff brings this cause of action individually and on behalf of the members of the proposed Class against Defendant.

196.   Defendant aided, agreed with, employed, and conspired with Google LLC and Comscore, Inc. to intercept the contents of Plaintiff's and Class Members' electronic communications with the Website. The intercepted contents consist of full page URLs

transmitted as payload parameters that reveal the substance and meaning of Plaintiff's communications, including URLs such as https://www.psychologytoday.com/us/archive?search=Low+sexual+drive+in+young+women, https://www.psychologytoday.com/us/basics/low-sexual-desire, and https://www.psychologytoday.com/us/blog/compassion-matters/201306/misconceptions-about-a-womans-sexuality.

197. Each of these content-bearing URL transmissions to Google and Comscore servers occurred while the browser was still receiving and rendering the webpage Plaintiff requested. The tracking requests were initiated and completed during the page-loading process itself, establishing that the third parties received and processed the contents of Plaintiff's communications while those communications remained in transit within the meaning of California Penal Code § 631(a).

198. These URLs do not merely identify server destinations; they reveal what Plaintiff and Class Members were reading, viewing, and engaging with on the Website. The transmission of these content-bearing URLs to third parties with independent advertising, profiling, and measurement interests constitutes an interception of the contents of Plaintiff's electronic communications within the meaning of California Penal Code § 631(a).

199. Google and Comscore are third parties to Plaintiff's communication with the Website. Each is an independent entity with its own advertising, profiling, measurement, and/or data brokerage interests that are separate from and beyond the Website's operation. Each used the intercepted content for its own commercial purposes, including behavioral profiling, advertising attribution, audience segmentation, identity resolution, and targeted advertising.

200. Defendant did not obtain consent from Plaintiff or any of the Class Members before aiding and facilitating the interception of the contents of their electronic communications. Defendant has thus violated California Penal Code § 631. CIPA

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

imposes civil liability and statutory penalties for violations of § 631. Cal. Penal Code § 637.2.

## IX.    THIRD CAUSE OF ACTION

### Violations of Cal. Constitution Article I § 1

### *By Plaintiff and the Class Members Against All Defendants*

201.    Plaintiff reasserts and incorporates by reference the allegations set forth in each preceding paragraph as though fully set forth herein.

202.    Plaintiff brings this cause of action individually and on behalf of the members of the proposed Class against Defendant.

203.    Article I, Section 1 of the California Constitution guarantees each individual an inalienable right to privacy. This constitutional provision supports a private right of action against both governmental and private actors who engage in conduct that constitutes a serious invasion of privacy.

204.    Plaintiff and the Class Members possess a legally protected privacy interest in the confidentiality of their online behavior, communications metadata, and identifying information, including but not limited to: IP address, browser details, session identifiers, page visit patterns, and clickstream behavior.

205.    Plaintiff and the Class Members had a reasonable expectation that their activity on Defendant's website, including what pages were visited, what content was interacted with, and when, would not be secretly tracked and transmitted to third parties via embedded surveillance code.

206.    Without Plaintiff's or the Class Members' knowledge or consent, Defendant caused the Trackers to be deployed on the Website.  The Trackers secretly transmitted Plaintiff's digital signaling data, addressing information (e.g., URLs accessed), and routing metadata (e.g., timestamps and referral paths) to the Third Parties, enabling behavioral profiling and cross-site identification.

207.    Defendant's conduct constitutes a serious and egregious invasion of Plaintiff's and the Class Members' informational privacy, far exceeding any routine or

67

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

1    incidental data handling. The deployment of real-time surveillance tools designed to

2    accomplish identity resolution and behavioral mapping is highly offensive to a

3    reasonable person.

4          208.   Defendant lacked any legitimate justification for failing to disclose or

5    obtain consent for this data interception and transfer. The magnitude of the privacy

6    intrusion outweighed any speculative or commercial benefit to Defendant.

7          209.   As a direct and proximate result of Defendant's actions, Plaintiff and the

8    Class Members have suffered a loss of control over personal data, emotional distress,

9    and a violation of their constitutional right to privacy.

### X.     FOURTH CAUSE OF ACTION

### Violations of Business & Professions Code § 17200

### *By Plaintiff and the Class Members Against All Defendants*

13          210.   Plaintiff realleges and incorporates by reference all preceding paragraphs

14    of this Complaint as though fully set forth herein.

15          211.   Plaintiff brings this cause of action individually and on behalf of the

16    members of the proposed Class against Defendant.

17          212.   This cause of action is brought under California Business & Professions

18    Code § 17200 et seq., which prohibits any unlawful, unfair, or fraudulent business act or

19    practice.

20          213.   Defendant has engaged in unlawful business practices by:

21          (a) Violating Article I, Section 1 of the California Constitution, which

22    protects individuals from serious invasions of privacy;

23          (b) Violating California Penal Code §§ 638.50–638.56, including the

24    unauthorized collection of addressing, signaling, and routing information for user

25    identification and tracking; and

26          (c). Violate California Penal Code §§ 631.

27          214.   Defendant has engaged in unfair business practices by embedding the

28    Trackers into the Website and enabling the real-time capture and transmission of

Plaintiff's and Class Members' personal and behavioral information, such as IP address, browser details, visited URLs, referrer paths, timestamps, and interaction events, to the Third Parties.

215. The Defendant's practices are contrary to public policy supporting consumer privacy and data autonomy, and the harm it causes to consumers, including loss of control over personal information and risk of profiling, outweighs any legitimate business justification.

216. Defendant has engaged in fraudulent business practices by failing to adequately disclose its data-sharing practices.  On information and belief, Defendant omitted material facts from its privacy policy and/or site interface and failed to inform users that their activities would be tracked across the internet and linked to unique identifiers for advertising and profiling purposes. These omissions were likely to deceive a reasonable consumer and were intended to obscure the nature and extent of the surveillance.

217. As a direct and proximate result of Defendant's unlawful, unfair, and fraudulent conduct, Plaintiff and the Class Members have suffered injury in fact and loss of money or property, including the unauthorized exfiltration and commodification of valuable personal data.  Plaintiff's and Class Members' data, used for targeted advertising, behavioral modeling, and enrichment by third parties, constitutes digital property with measurable economic value.

218. Plaintiff on behalf of himself and on behalf of the Class Members seeks injunctive relief to prevent Defendant from continuing its deceptive and unlawful data tracking practices and to require clear and conspicuous notice and opt-in consent for any behavioral tracking involving third-party tools. Plaintiff on behalf of himself and on behalf of the Class Members, also seeks restitution of the value derived from the unauthorized use of their personal information, attorneys' fees where permitted by law, and such other and further relief as the Court may deem just and proper.

/ / /

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## XI.    **FIFTH CAUSE OF ACTION**

### Intrusion Upon Seclusion

### *By Plaintiff and the Class Members Against All Defendants*

219.    Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

220.    Plaintiff brings this cause of action individually and on behalf of the members of the proposed Class against Defendant for intrusion upon seclusion, a well-established common law tort recognized in California, which protects individuals from intentional invasions of their private affairs in a manner that would be highly offensive to a reasonable person.

221.    At all relevant times, Plaintiff and the Class Members had a reasonable expectation of privacy in their online browsing activity, including their interactions with the Website, the specific content viewed, and the behavioral signals generated through use of the website, such as page views, click paths, session timestamps, and form entries.

222.    Without Plaintiff's or Class Members' knowledge or consent, Defendant intentionally deployed the Trackers on the Website. This tool was engineered to surreptitiously capture and transmit granular behavioral data, including addressing, signaling, and routing information such as IP addresses, URL paths, referrers, device attributes, and mouse activity, to third parties.

223.    The data collected was detailed and persistent, enabling Third Parties to monitor Plaintiff's and Class Members' conduct across websites, associate that behavior with unique identifiers, and build a behavioral profile of Plaintiff and Class Members for marketing and data monetization purposes.

224.    Defendant's actions were intentional, systematic, and designed to operate in a manner undetectable by users. At no point did Defendant provide clear, conspicuous disclosure of this surveillance, nor did it obtain affirmative consent from Plaintiff and Class Members to conduct such monitoring or transmit the collected data to third parties.

225.    The nature of this covert surveillance, especially its capacity to link online

70

1  activity to identifiable users, would be highly offensive to a reasonable person,
2  particularly in light of growing public sensitivity to privacy rights and digital
3  surveillance.

4  226.  As a direct and proximate result of Defendant's conduct, Plaintiff and the
5  Class Members suffered an invasion of privacy, loss of control over personal
6  information, and emotional harm, including anxiety, indignity, and concern over being
7  unknowingly tracked, profiled, and exposed to targeted advertising based on private
8  digital conduct.

9  227.  Defendant's conduct was willful, malicious, and oppressive, thereby
10  justifying the imposition of punitive and exemplary damages.

## XII.  SIXTH CAUSE OF ACTION

### Unjust Enrichment

### *By Plaintiff and the Class Members Against All Defendants*

14  228.  Plaintiff realleges and incorporates by reference all preceding paragraphs
15  of this Complaint as though fully set forth herein.

16  229.  Plaintiff brings this cause of action individually and on behalf of the
17  members of the proposed Class against Defendant for unjust enrichment, asserting that
18  Defendant has been unjustly enriched through the unauthorized and uncompensated
19  acquisition, use, and monetization of Plaintiff's and Class Members' personal data.

20  230.  Plaintiff and the Class Members, while visiting and interacting with the
21  Website, unknowingly conferred a substantial benefit on Defendant by generating digital
22  behavioral data, including but not limited to IP address, device information, browser
23  metadata, URL paths, session timestamps, and interaction signals.

24  231.  Defendant deployed the Trackers without Plaintiff's and Class Members'
25  knowledge or meaningful consent. The data collected was then used by Defendant and/or
26  third parties to conduct behavioral targeting, analytics, and advertising optimization that
27  generated substantial financial value.

28  232.  At no time did Plaintiff and Class Members consent to the commercial

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

exploitation of this data. Nor was Plaintiff and Class Members informed that their online behavior would be tracked and monetized in this manner. Plaintiff and Class Members received no compensation, disclosure, or opportunity to prevent the enrichment conferred upon Defendant.

233.   Defendant's retention and use of this benefit was unjust and inequitable. The value of Plaintiff's and Class Members' behavioral data, when compiled, analyzed, and integrated into advertising algorithms or consumer profiling tools, constitutes a marketable asset in the digital economy. Defendant's ability to extract revenue from this asset without disclosure or fair exchange renders its conduct unjust.

234.   Under principles of equity and good conscience, Defendant should be required to disgorge all ill-gotten gains and benefits received as a result of its unjust enrichment at Plaintiff's and Class Members' expense.

## XIII.  <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff prays for the following:

1.  An order certifying the Class, naming Plaintiff as Class representative, and naming Plaintiff's attorneys as Class counsel;

2.  An order declaring that Defendant's conduct violates CIPA, specifically California Penal Code §§ 638.51 and 631, the California Constitution, and Business & Professions Code § 17200;

3.  An order declaring that Defendant's conduct unlawfully intrudes upon the seclusion of Plaintiff and the Class Members;

4.  An order declaring that Defendant's conduct unlawfully intercepts the contents of Plaintiff's and Class Members' electronic communications and unlawfully installs and uses pen register and trap-and-trace devices in violation of CIPA;

5.  An order of judgment in favor of Plaintiff and the Class against Defendant on the causes of action asserted herein;

6.  An order enjoining Defendant's conduct as alleged herein;

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

7.  Disgorgement of profits derived from the unlawful interception of communications and use of pen register and trap-and-trace devices;

8.  Disgorgement of profits resulting from unjust enrichment;

9.  Statutory damages pursuant to CIPA;

10. Prejudgment interest;

11. Reasonable attorney's fees and costs; and

12. All other relief that would be just and proper as a matter of law or equity.

<u>**DEMAND FOR JURY TRIAL**</u>

Plaintiff hereby demands a trial by jury on all causes of action and issues so triable.

Respectfully submitted,

Dated:   March 9, 2026          **NATHAN & ASSOCIATES, APC**


By:  /s/ Reuben D. Nathan
Reuben D. Nathan
2901 W. Coast Hwy., Suite 200
Newport Beach, CA 92663
Office: (949) 270-2798
Email: rnathan@nathanlawpractice.com


**LAW OFFICES OF ROSS CORNELL, APC**
Ross Cornell, Esq. (SBN 210413)
P.O. Box 1989 #305
Big Bear Lake, CA 92315
Office: (562) 612-1708
Email: rc@rosscornelllaw.com


*Attorneys for Plaintiff and the Putative Class*

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED